ATTORNEY GENERAL v MICHIGAN PUBLIC SERVICE
COMMISSION

Docket Nos. 67938, 67944, and 67945. Argued October 15, 1981
(Calendar Nos. 23, 24, and 25).—Decided January 27, 1982.

Docket Nos. 67944, 67945. The Detroit Edison Company sought
the approval of the Michigan Public Service Commission for
the issuance of $625 million in securities, part of which would
finance the continued construction of the Enrico Fermi 2 nu-
clear-powered generating plant and the Belle River coal-fired
generating plants, and part of which would retire maturing
short-term and long-term debt. A year later, Edison sought
approval of the issuance of an additional $1.996 billion in
securities, primarily to finance continued construction of the
power plants and to retire existing short-term and long-term
debt.

Docket No. 67938. Consumers Power Company sought the ap-
proval of the Michigan Public Service Commission for the
issuance of $564 million in securities, primarily to finance the
continued construction of the Midland nuclear-powered genera-
ting plant and to retire maturing short-term and long-term
debt.

In all three cases, the Attorney General and the Michigan
Citizens Lobby intervened at the commission's hearings on the
applications for approval. They argued in each case that the
power plants under construction were unnecessary and unrea-
sonably costly, and that the commission should not approve
issuance of the securities insofar as the proceeds would be used
to finance their construction. In each case the commission
declined to consider evidence relating to the need for the power
plants, and authorized issuance of the securities. While appeals
by the intervenors were pending in the Court of Appeals, the

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4-8, 10-13] 64 Am Jur 2d, Public Securities and Obligations
§§ 107, 181.
64 Am Jur 2d, Public Utilities §§ 225, 264.
[3] 64 Am Jur 2d, Public Securities and Obligations § 96.
[9] 2 Am Jur 2d, Administrative Law §§ 233, 241, 243.
[11-13] 64 Am Jur 2d, Public Utilities § 240 et seq.

Supreme Court granted leave to appeal prior to decision by the Court of Appeals and ordered the three cases consolidated for argument.

In an opinion by Justice Levin, joined by Chief Justice Coleman and Justices Kavanagh, Fitzgerald, and Ryan, the Supreme Court *held:*

In a proceeding under the utility securities act as written, the inquiry is limited to whether there is a need to issue securities to obtain funds for a lawful purpose of the utility and does not extend to whether, to accomplish that purpose, there is a need for the project to which the funds will be devoted. The inquiry is the need for the funds, not the need for the project. It may be wise, in this era of multi-billion-dollar power plants, for the commission to pass upon the necessity for any such plant before construction begins, but the policy question whether approval by the commission should be required before construction begins is properly for the Legislature, and not for the Court, to decide.

1. The statute requires that in the opinion of the commission the use of the capital to be raised by the issuance of securities is reasonably required for the purposes of the utility. The intervenors argue that this means that the commission must find that the underlying projects are reasonably required, not only whether the funds are reasonably required for the projects. But two other uses of the word "purposes" in the statute show that it means "the acquisition of property, the construction, completion, extension or improvement of facilities or * * * the improvement or maintenance of service or * * * the discharge or lawful refunding of obligations". No one has argued that construction of additional generating capacity is not a lawful utility purpose. It is a separate question whether the utility needs the additional generating capacity, as it is whether the additional capacity should be fossil- or nuclear-fueled or whether the proposed plant is cost-efficient or reasonable.

2. The act does not give the commission discretion to inquire into immaterial subjects in determining whether it should grant the authority to issue the securities. The Michigan cases cited by the intervenors show that a securities issue proceeding is limited to a review of the financial decisions of the utility, and does not go into the reasonableness of the underlying projects. The utilities statutes of other jurisdictions offer little guidance in construing the Michigan act; some are too dissimilar, and others contain language given diverse interpretations.

3. The intervenor's assumption that the utility securities act

provides the only means of inquiry into the reasonableness of plants during construction is inaccurate. Ongoing construction is evaluated during rate hearings under the electricity transmission act approximately yearly, and, in addition, the utility can request that construction work in progress be included in the rate base. Moreover the commission, in the exercise of its supervisory powers, may conduct pre-construction review without regard to whether the utility seeks to have the plant's costs included in the rate base.

4. The Court cannot confidently predict that the Legislature would today conclude that the reasonableness of a utility construction project should be made the subject of a pre-construction hearing. The Legislature might conclude that the public interest is better served by the present system which requires a utility, its shareholders, and its bondholders to carry the risk involved in deciding to construct additional generating capacity. If they have made erroneous decisions and the cost of the addition is not included in the rate base, stockholders or bondholders or both would lose, but the ratepayers would be largely unaffected.

The orders of the commission authorizing the issuance of securities are affirmed in all three cases.

Justice Williams, joined by Justice Moody, writing separately, would hold that the intention of the Legislature was that there should be a complete feasibility examination both at the time of the original financing application and at the time of ratemaking, that is, when it is determined whether the plant should be included in the utility's rate base. At the time of a subsequent financing application a complete feasibility examination is not necessary and the more limited determination of the necessity of the financing is adequate. Their opinion is based both on the construction of the statute and on consideration of policy implications. The Legislature, by requiring property for which securities were to be issued to be reasonably required for the purposes of the utility, intended two things: 1) that the property be employed, in this use, "for the * * * completion of facilities", and 2) that the property be reasonably required for a utility purpose within the overall context of utility regulation, namely property that would adequately serve consumers at a reasonable rate and make a reasonable return for the utility. The latter determination will be achieved if the MPSC makes a complete feasibility examination at the time of the original application for financing and later evaluates the costs of the project when the utility requests inclusion in the rate base. It was not the legislative intent to allow a utility's

investors to invest billions of dollars in a facility that will be evaluated for viability at the time a company requests inclusion of the costs of the facility in its rate base, when failure to include the costs might bankrupt the utility and inclusion might compel the consumers to pay unreasonably swollen rates.

OPINION OF THE COURT

1. PUBLIC UTILITIES — UTILITY SECURITIES ACT — PUBLIC SERVICE COMMISSION — SCOPE OF INQUIRY.

In a proceeding under the utility securities act as written, the inquiry is limited to whether there is a need to issue securities to obtain funds for a lawful purpose of the utility and does not extend to whether, to accomplish that purpose, there is a need for the project to which the funds will be devoted (MCL 460.301 *et seq.;* MSA 22.101 *et seq.).*

2. PUBLIC UTILITIES — UTILITY SECURITIES ACT — PUBLIC SERVICE COMMISSION — SCOPE OF INQUIRY.

The utility securities act requires that in the opinion of the Michigan Public Service Commission the use of the capital to be raised by the issuance of securities is reasonably required for the purposes of the utility; however, the inquiry is the need for the funds, not the need for the project (MCL 460.301 *et seq.;* MSA 22.101 *et seq.).*

3. PUBLIC UTILITIES — UTILITY SECURITIES ACT — PUBLIC SERVICE COMMISSION — WORDS AND PHRASES — PURPOSES.

The uses of the word "purposes" in the utilities securities act show that it means "the acquisition of property, the construction, completion, extension or improvement of facilities or * * * the improvement or maintenance of service or * * * the discharge or lawful refunding of obligations" (MCL 460.301 *et seq.;* MSA 22.101 *et seq.).*

4. PUBLIC UTILITIES — UTILITY SECURITIES ACT — PUBLIC SERVICE COMMISSION — PURPOSES.

No one has argued that construction of additional generating capacity is not a lawful utility purpose under the utility securities act; but it is a separate question whether the utility needs the additional generating capacity, as it is whether the additional capacity should be fossil- or nuclear-fueled or whether the proposed plant is cost-efficient or reasonable (MCL 460.301 *et seq.;* MSA 22.101 *et seq.).*

5. PUBLIC UTILITIES — UTILITY SECURITIES ACT — PUBLIC SERVICE
    COMMISSION — SCOPE OF INQUIRY.

   The utility securities act does not give the commission discretion
   to inquire into immaterial subjects in determining whether it
   should grant the authority to issue the securities (MCL 460.301
   *et seq.;* MSA 22.101 *et seq.).*

6. PUBLIC UTILITIES — UTILITY SECURITIES ACT — PUBLIC SERVICE
    COMMISSION — SCOPE OF INQUIRY.

   A securities issue proceeding, under the utility securities act, is
   limited to a review of the financial decisions of the utility, and
   does not go into the reasonableness of the underlying projects
   (MCL 460.301 *et seq.;* MSA 22.101 *et seq.).*

7. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — POWER PLANTS
    — STATUTES.

   A rate hearing by the Michigan Public Service Commission under
   the transmission act or an investigation upon complaint under
   the general enabling act provides an adequate method for
   questioning the continued construction of a power plant with-
   out disturbing the ongoing construction; it is unnecessary and
   inappropriate to suspend the issuance of securities for the
   power plant under the utility securities act and to interrupt the
   construction while the necessity of the plants is fully and
   carefully considered (MCL 460.58, 460.301 *et seq.,* 460.552; MSA
   22.8, 22.101 *et seq.,* 22.152).

8. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — POWER PLANTS
    — STATUTES.

   The policy question whether approval by the Michigan Public
   Service Commission should be required before construction
   begins on a power plant is properly for the Legislature, and not
   for the Court, to decide.

9. ADMINISTRATIVE LAW — ATTORNEY AND CLIENT — APPEAL —
    STATUTES — CONSTRUCTION.

   The view in an appellate brief of a lawyer representing a regula-
   tory commission charged with the administration of an act
   should not be accepted by the Court as an authoritative con-
   struction by the agency.

10. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — UTILITY SECU-
    RITIES ACT — STATUTES.

   The authoritative statement of the view of the Michigan Public
   Service Commission regarding the meaning of the utility secu-

rities act is to be found in its decisions and opinions (MCL 460.301 *et seq.;* MSA 22.101 *et seq.).*

## Separate Opinion by Williams, J.

11. Public Utilities — Utility Securities Act — Public Service Commission — Power Plants — Ratemaking.

> *The intention of the Legislature in the utility securities act was that there should be a complete feasibility examination of a power plant by the Michigan Public Service Commission both at the time of the original financing application and at the time of ratemaking, that is, when it is determined whether the plant should be included in the utility's rate base; at the time of a subsequent financing application a complete feasibility examination is not necessary and the more limited determination of the necessity of the financing is adequate (MCL 460.301 et seq.; MSA 22.101 et seq.).*

12. Public Utilities — Utility Securities Act — Public Service Commission — Power Plants — Ratemaking.

> *The Legislature, by requiring property for which securities were to be issued by a public utility to be reasonably required for the purposes of the utility, intended two things: 1) that the property be employed, in this use, "for the \* \* \* completion of facilities", and 2) that the property be reasonably required for a utility purpose within the overall context of utility regulation, namely property that would adequately serve consumers at a reasonable rate and make a reasonable return for the utility.*

13. Public Utilities — Utility Securities Act — Public Service Commission — Power Plants — Ratemaking.

> *It was not the legislative intent to allow a utility's investors to invest billions of dollars in a facility that will be evaluated for viability at the time a company requests inclusion of the costs of the facility in its rate base, when failure to include the costs might bankrupt the utility and inclusion might compel the consumers to pay unreasonably swollen rates (MCL 460.301 et seq.; MSA 22.101 et seq.).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Hugh B. Anderson, Roderick S. Coy* and *Patrick J. Devlin,* Assistants Attorney General, and *Deborah K. Canja* for plaintiffs Attorney General and Michigan Citizens Lobby.

*Arthur E. D'Hondt* and *Leo H. Friedman,* Assistants Attorney General, for defendant Michigan Public Service Commission.

*Lawrence B. Lindemer, Allen B. Bass,* and *Paula H. Mills,* and *Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *George W. Loomis, William D. Parsley* and *Michael G. Oliva)* for defendant Consumers Power Company.

*Foster, Swift, Collins & Coey, P.C.* (by *Theodore W. Swift, David W. McKeague* and *Charles E. Barbieri),* and *Leon S. Cohan* and *Thomas A. Hughes* for defendant The Detroit Edison Company.

Amici Curiae:

*Conner, Harbour & Dew* (by *Pat D. Conner)* and *Thomas Cresswett* for The Dow Chemical Company.

*Max Dean* for Fusion Energy Foundation.

*Donald J. Prebenda* and *Paul Jacobs* for Michigan State and Greater Detroit Building and Construction Trades Councils, AFL-CIO.

LEVIN, J. The question presented concerns the scope of inquiry by the Michigan Public Service Commission when a public utility requests authorization to issue securities. We are persuaded, upon examination of the language of this state's utility securities act,[1] Michigan cases construing the act, cases construing similar statutes in other jurisdictions, and Michigan's utility regulation scheme, that the scope of inquiry in a securities issue proceeding does not extend to the wisdom of the

---

[1] MCL 460.301 *et seq.;* MSA 22.101 *et seq.*

project which a utility seeks to fund through the issuance of long-term securities.

## I

Three cases have been consolidated in this appeal, each presenting the same issue.[2]

In No. 67944 *("Edison I")*, the utility, in July 1979, sought approval pursuant to the act for the issuance of $625 million in securities,[3] part of which would finance the continued construction of the Enrico Fermi 2 nuclear generating plant and the Belle River coal-fired generating plants and part of which would retire maturing short-term and long-term debt. At the commission hearing, the Attorney General and Michigan Citizens Lobby (MCL) intervened, contending that the plants were unnecessary and unreasonably costly. Specifically, the intervenors criticized the utility's 15-year forecast of energy needs, termed the utility's planned "reserve margins" (capacity in excess of anticipated peak demand) unjustifiably large, asserted that a nuclear generating plant is considerably more expensive than a coal-fired unit of similar capacity, and argued that continual cost

[2] A fourth case, presently before the Court of Appeals, involves the same issue. Two rural electric cooperatives own 20% of Fermi 2. In January 1980, the cooperatives sought permission to issue an additional $181 million of securities to finance their share of the cost overruns of Fermi 2. The commission authorized the securities and refused to inquire into the underlying project. *Re Wolverine Electric Cooperative, Inc,* case no U-5407 (Nov 25, 1980); *Re Northern Michigan Electric Cooperative, Inc,* case no U-5408 (Nov 25, 1980).

[3] The utility sought authorization to issue 7,500,000 shares of common stock, $90 million aggregate amount of preference stock or preferred stock or any combination thereof, $365,000,000 aggregate principal amount of general and refunding mortgage bonds, and $50 million aggregate principal amount of general and refunding mortgage bonds or an equivalent amount of promissory notes for early redemption of its series CC bonds due January 15, 1982. *Re Detroit Edison Co,* case no U-6217, pp 18-19 (Apr 1, 1980).

overruns indicated that Fermi 2, if completed, would prove far more expensive than the utility had originally calculated. On April 1, 1980, the commission authorized issuance of the securities. Declining to consider the evidence pertaining to ongoing plant construction presented to the hearing officer, the commission found construction of the plants a lawful purpose of the utility and found the issuance of securities reasonably required to provide funds for the construction of the plants.[4] On May 9, 1981, the Attorney General and MCL filed a delayed application for leave to appeal in the Court of Appeals, which was denied on June 11, 1980. On May 11, 1981, this Court remanded the cause to the Court of Appeals for consideration as on leave granted.[5]

In No. 67945 *("Edison II")*, the utility sought authorization in July 1980 to issue an additional $1.996 billion in securities,[6] primarily to finance continued construction of the power plants and to retire short-term and long-term debt already incurred. Again the Attorney General and MCL intervened, challenging the issuance of the securities insofar as the proceeds would be used in respect to the construction of the power plants, which the intervenors claimed was unreasonable.

[4] The commission found that a consideration of ongoing construction projects was "unnecessary and irrelevant" in a securities proceeding. *Id.*, p 17. The commission indicated, however, that in a future securities issue proceeding where the utility intends to finance a new plant, the need for the plant would be investigated. *Id.*

[5] 411 Mich 903 (1981).

[6] The securities were to include $60 million in bonds to collateralize pollution control bonds, $90 million aggregate value of preferred stock and preference stock, 9,750,000 shares of common stock, several installment sales contracts "to the extent they constitute evidences of indebtedness", $800 million of long-term promissory notes (as required by the Belle River Project Financing Credit and Term Loan Agreement), another $800 million in bonds to refund those Belle River notes, and $100 million in bonds to retire short-term and long-term debt. *Re Detroit Edison Co*, case no U-6557, pp 1-2 (July 7, 1981).

On July 7, 1981, the commission approved the issuance of the securities, and declared that "[e]vidence relating to electric load forecasting and generating plant alternatives is irrelevant and immaterial in carrying out the intent of 1909 PA 144 [the utility securities act]".[7] On August 6, 1981, the Court of Appeals stayed the commission's order approving issuance of the securities. This Court denied an emergency application for leave to appeal the stay.[8]

In No. 67938 *("Consumers Power"),* the utility sought permission in December 1979 to issue $564 million in securities,[9] primarily to finance the continued construction of the Midland nuclear generating plant and to retire maturing short-term and long-term debt. The Attorney General and MCL intervened in this proceeding as well, arguing that the Midland nuclear plant had far exceeded original cost projections and that continued construction was unjustified. The commission approved the issuance of the securities on August 4, 1981, and again declared that a securities issue proceeding was an inappropriate time to inquire into the utility's construction program.[10] On Sep-

---

[7] *Id.,* p 18. The commission said that the requirements of the utilities securities act had been met:

"The evidence presented by applicant in this proceeding established that: (1) the proceeds from the sale of securities for which authorization is herein sought are intended for specific lawful purposes as required by 1909 PA 144, as amended (MCL 460.301); (2) the proposed issues are essential to carry out such purposes; and (3) the use of such funds is reasonable and necessary to meet the requirements of applicant's construction program." *Id.,* p 24.

[8] 411 Mich 1028 (1981).

[9] The securities were to consist of $250 million of long-term debt, 1 million shares of preferred stock, 4 million shares of preference stock, and 8.5 million shares of common stock. *Re Consumers Power Co,* case no U-6360, pp 1-2 (Aug 4, 1981).

[10] *Id.,* pp 20-28. Partial final orders on May 19, 1980, and August 8, 1980, had approved $201 million of the originally requested securities so that the utility could retire maturing debt. The utility moved for a

tember 14, 1981, the Court of Appeals granted the
intervenors' application for leave to appeal, but
denied a request for a stay of the commission's
order authorizing issuance of the securities.

On September 15, this Court, in *Consumers
Power,* granted a stay of the commission's order
and bypass of the Court of Appeals, granted bypass
on its own initiative in *Edison I* and *II,* and
ordered all three cases consolidated for argument.[11]

Following oral argument, this Court, on October
16, 1981, lifted the stays in *Edison II* and *Consumers Power.*[12]

## II

The Attorney General and MCL contend that
the utility securities act requires the commission
to determine that projects to be funded by the
issuance of securities are reasonable. The commission and the utilities contend that the act grants
the commission broad discretion in determining
the scope of inquiry in a securities issue proceeding and does not mandate an inquiry into the
reasonableness of a project.

We conclude that the utility securities act does
not provide for an inquiry into the reasonableness
of a project. Because such an inquiry is not material in a proceeding under the utility securities
act, the commission has no discretion in such a

third partial final order on September 4, 1980, for the same purpose.
The administrative law judge recommended denial, and the commission did not rule on the request before its August 4, 1981, final order.

Not yet a member of the commission when the order in *Edison I*
was issued, Commissioner Anderson dissented in both *Edison II* and
*Consumers Power.* She said that the commission had adopted an
"unnecessarily narrow" interpretation of the utilities securities act.

[11] 411 Mich 1063-1065 (1981).

[12] 411 Mich 1064, 1065 (1981).

proceeding to inquire into the reasonableness of a project.

The Michigan cases cited by the Attorney General and MCL do not hold that the commission must investigate the wisdom of underlying projects; those cases indicate that the concern of the act is more limited. The cases from other jurisdictions cited by the Attorney General and MCL provide limited guidance.

We hold that, in a proceeding under the utility securities act, the inquiry is limited to whether there is need to issue securities to obtain funds for a lawful purpose of the utility and does not extend to whether, to accomplish that purpose, there is need for the project to which the funds will be devoted. The inquiry is whether funds are required to construct the project—the need for the funds, not the need for the project.

## A

The utility securities act, as amended, is set forth in the margin.[13] Subsection (1) provides that

[13] "(1) A person, corporation, or association, * * * owning, conducting, managing, operating, or controlling a plant or equipment within this state used wholly or in part in the business of * * * producing or furnishing heat, artificial gas, light, water, or mechanical power to the public, * * * may issue stocks, bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date of issuance, if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations and may issue stock to represent accumulated earnings invested in capital assets and not previously capitalized, if the public service commission issues an order authorizing the issue and the amount of the issue, and states that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of the stock, bonds, notes, or other evidences of indebtedness, is reasonably required for the purposes of the person, corporation, or association, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized. Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base.

"(2) A person, corporation, or association desiring authority to issue stocks, bonds, notes, or other evidences of indebtedness shall make written application to the commission in the form as the commission requires. After receiving the application, the commission, for the purpose of determining whether the commission should grant the authority, may make an inquiry or investigation, hold hearings, and examine witnesses, books, papers, documents, or contracts the commission considers of importance in enabling it to reach a determination. An interested person, including municipalities and organizations whose membership consists of a substantial number of ratepayers within the service area of the utility, shall have the right to intervene as provided in the rules of the commission. If the applicant fails, neglects, or refuses to furnish the information required by the commission, or if the commission directs, an appraisal of the property of the applicant shall be made by a disinterested person to be appointed by the commission and whose compensation shall be fixed by the commission. The entire expense of making the appraisal shall be borne by the applicant. After the appraisal is made and filed with the commission and before any action is taken by the commission upon the application, the expenses of the appraisal as determined by the commission shall be paid by the applicant to the commission, which shall deposit the amount in the treasury of the state to be credited to the general fund, taking the receipt of the treasurer for the deposit and filing the receipt in the commission's office with the application. If the applicant refuses or neglects to pay the expense of the appraisal, the commission shall dismiss the application and the commission may bring an action against the applicant in a court of competent jurisdiction in this state for the recovery of the expense of the appraisal. The expense of the appraisal shall be paid by the state treasurer to the person certified by the commission to be entitled to the appraisal fee.

"(3) If from the application filed and other information obtained from the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized, the commission shall grant authority to make the issue. In granting the authority, the commission may impose as a condition of the grant reasonable terms and conditions that the commission considers proper.

"(4) A person, corporation, or association may issue notes for lawful purposes, payable at periods of not more than 24 months, without authority from the commission; but the notes shall not in whole or in part, be refunded by an issue of stock or bonds or by an evidence of indebtedness running for more than 12 months without the consent of the commission.

\* \* \*

"(7) Stocks, bonds, notes, or other evidences of indebtedness issued pursuant to an order of the commission shall be binding in accor-

a utility may issue long-term securities only if authorized by the commission. An order authorizing the issuance of securities must state that "in the opinion of the commission the use of the capital * * * to be secured by the issue of the [securities] is *reasonably required for the purposes* of the [utility]". (Emphasis supplied.) The Attorney General and MCL argue that this language requires the commission to determine that underlying projects are reasonably required, and not only, as the utilities contend and the commission found, whether the funds are reasonably required to construct the projects.

Subsection (3) provides that "the commission *shall* grant authority to make the issue" (emphasis added) if it is "satisfied that the funds derived from the issue of [the securities] *are to be applied to lawful purposes* and that the issue and amount is essential to the successful carrying out of the purposes". (Emphasis added.) The commission and utilities argue that this language indicates the commission is required to make only two determinations before authorizing the issuance of securities: (1) that the funds will be applied to lawful purposes; and (2) that the issue, and the size of the issue, are essential to carrying out those purposes.

The parties thus rely on different and seemingly dissimilar subsections of the statute.[14] There is,

_____

dance with their terms notwithstanding that the order of the commission is later vacated, modified, or otherwise held to be invalid in whole or in part, unless either of the following occurred:

"(a) Operation of the order of the commission has been stayed or suspended by the reviewing court before issuance, which issuance shall not precede the expiration of 30 days following the date of the final order of the commission. * * *" MCL 460.301; MSA 22.101.

[14] If it is thought that there is a conflict in the act regarding the proper scope of commission inquiry, subsection (3) appears to us to provide a better indication of legislative intent. Addressed to the utilities, subsection (1) provides that a utility may issue long-term securities only if it has obtained commission authorization. Addressed

however, no difference in meaning. The conditions upon which a utility may issue securities are first described in subsection (1):

"[A utility may issue securities] *if necessary for the acquisition of property, the construction,* completion, extension, or improvement *of facilities* or for the improvement or maintenance of service or for the discharge of lawful refunding of obligations * * *." (Emphasis supplied.)

These three references to the need for the securities, twice in subsection (1) and once in subsection (3), are equivalent, as the alternative purpose stated in tandem with each of the three references further indicates.[15]

The Attorney General and MCL concentrate on the second reference in isolation and ask this Court to construe that second reference, "reasonably required for the purposes", to mean that the use of the funds must be reasonable. If the second reference in subsection (1) were the only articulation in the act of the standard, the Attorney General and MCL might offer a reasonable construction of the act.[16] The other two references, however, clarify the term "purposes": not the general utility purposes of providing service to the public at reasonable rates, but rather "lawful purposes" (subsection [3]), which the statute first describes in subsection (1) as "the acquisition of

to the commission, subsection (3) prescribes the conditions upon which it shall grant authorization.

[15] The act allows a utility to "issue stock to represent accumulated earnings invested in capital assets and not previously capitalized" and requires the commission to find that "the issue of the stock fairly represents accumulated and undistributed earnings *invested in capital assets* and not previously capitalized". (Emphasis supplied.) This alternate purpose was added by 1919 PA 381 to each of the three references in the utility securities act.

[16] See text following fn 31.

property, the construction, completion, extension, or improvement of facilities or * * * the improvement or maintenance of service or * * * the discharge or lawful refunding of obligations".

The failure to modify "purposes" where, in the second reference, it first appears is not significant. The first reference lists a number of possibl. utility purposes. The second reference abbreviates that list with the phrase "purposes of the person, corporation, or association". The third reference, even shorter, simply states "lawful purposes". Read in context, the third version does not mean any purpose that is lawful, *i.e.,* not illegal, but rather a lawful purpose described or implied in the first reference. Similarly, the second reference, "purposes of the [utility]", must mean "lawful purposes". Thus "reasonably required" means reasonably required for a lawful utility purpose.

We need not hold that the first reference to "purposes" constitutes an exclusive list of lawful utility purposes. We conclude only that the three references to "purposes" are equivalent in their description of the scope of commission inquiry.[17]

No one has argued that constructing additional generating capacity does not constitute a lawful utility purpose. It is a separate question whether the utility needs the additional generating capacity, as is whether that additional generating capacity should be fossil- or nuclear-fueled or whether the proposed plant is cost-efficient or "reasonable". We have already stated our conclusion that these

[17] There remains a possible ambiguity in the act, but not regarding the scope of the commission's inquiry. The three references regarding the standard provide for different levels of commission scrutiny. The act states that the commission shall determine whether the securities are (1) "necessary" for the purpose; (2) "reasonably required" for the purpose; or (3) "essential" to the purpose. Since the proper level of commission scrutiny is not before us today, we need not consider that question.

separate questions cannot be raised in a utility securities act proceeding.

## B

The commission and the utilities do not contend that the reasonableness of underlying projects may never be within the scope of the commission's inquiry in a securities issue proceeding.[18] They assert, rather, that the commission possesses broad discretion regarding the scope of the inquiry,[19] and that the commission did not abuse its discretion by refusing to inquire into the reasonableness of the underlying projects in this case.

The exercise of agency discretion in a matter of this kind is subject to judicial review as provided for in Const 1963, art 6, § 28, and therefore the utility securities act cannot give the commission absolute discretion regarding the scope of its inquiry.

To hold that the commission has discretion would subject every decision, whether to inquire or not to inquire into the reasonableness of a project, to "direct review by the courts" with the attendant delays. The question of *whether* the merits should be inquired into might thus postpone such inquiry

[18] The utilities suggest that the commission need not hold a hearing at all. However, subsection (7)(b), added in 1977, provides that the securities issued pursuant to an underwritten public offering and registered under Title I of the Securities Act of 1933 by an electric utility with assets of over $1 billion are not necessarily valid obligations if the commission did not hold a hearing before authorizing their issuance, which may imply that the commission must hold a hearing before authorizing the issuance of such securities by an electric utility with over $1 billion in assets.

[19] They rely on the clause reading, "the commission * * * *may* make an inquiry or investigation, hold hearings, and examine witnesses, books, papers, documents, or contracts the commission *considers of importance* in enabling it to reach a determination". (Emphasis supplied.) MCL 460.301(2); MSA 22.101(2).

into the merits under provisions of law which provide means therefor. See Part III, *infra*.

While the utility securities act empowers the commission to make any inquiry "the commission considers of importance", that inquiry must be "for the purpose of determining whether the commission should grant the authority".[20] The act does not give the commission discretion to inquire into immaterial subjects.

## C

The Michigan cases cited by the Attorney General and MCL do not demonstrate that the reasonableness of underlying projects is a material inquiry in a securities issue proceeding. Rather, the cases show that a securities issue proceeding is limited to a review of the financial decisions of the utility.

In *Michigan Gas Storage v PSC*, 405 Mich 376; 275 NW2d 457 (1979), and *Indiana & Michigan Power Co v PSC*, 405 Mich 400; 275 NW2d 450 (1979), this Court declared that the utility securities act is intended to protect not only investors in utility securities, but also the ratepayers. The question now presented is *how* the act protects ratepayers. "The issuance of securities has an important bearing on the financial structure of a public utility and that in turn has a direct bearing on the rates set for such companies." *Great Lakes Transmission Co v MPSC*, 24 Mich App 77, 85; 180 NW2d 59 (1970). The commission can protect the interests of ratepayers in securities issue proceedings by reviewing the utility's financial structure without inquiring into the reasonableness of underlying projects.

[20] *Id.*

The Attorney General and MCL direct our attention to the statement in *Hillsdale Light & Fuel Co v MPUC,* 220 Mich 101, 105; 189 NW 893 (1922), indicating that the act was intended to prevent overcapitalization. They argue that overcapitalization may be caused by "unreasonable, imprudent and unnecessary capital expenditures". In *Hillsdale,* this Court held that the commission had the power to regulate the amount of stock issued by a utility:

"Manifestly if the plain purpose of the [utility securities act] was to prevent the over-capitalization of public utilities, the amount of its capital stock and bonds should correlate with the amount and value of its property. The commission was empowered by the act to fix the amount of the issue of the stock and bonds and quite properly fixed it at the value of the property."

The commission protects against "overcapitalization", as defined in *Hillsdale,* by determining that "the amount of [the utility's] capital stock and bonds * * * correlate[s] with the amount and value of its property". In *Hillsdale,* the commission determined the value of the property by reviewing the accounting method[21] used and did not investigate the need for the property.

The Attorney General and MCL also quote at length from the dissenting opinion of Justice BIRD in *Venner v Michigan Railroad Comm,* 205 Mich 573, 578; 172 NW 567 (1919), for the proposition that the utility securities act was designed to protect the investor from "reckless and unlawful expenditures". The question in *Venner* was whether the commission had the power to autho-

[21] The central question in *Hillsdale* was the proper accounting method to be used in evaluating the property: "cost of reproduction new less depreciation", or a more flexible combination of prior appraisals plus going concern value.

rize the issuance of securities that would capitalize expenditures already made.[22] Justice BIRD argued that the commission had no such power, but must instead approve in advance all expenditures that the utility intends to capitalize later, since in his view overcapitalization could occur just as easily through unlawful expenditures as through the issuance of excess stock: "The abuses which the act was created to prevent give the impression that it was intended by the legislature that the commission should pass upon the *lawfulness* of the expenditures before they were made, and if found *unlawful* to prevent them from being made." 205 Mich 577. (Emphasis added.) Thus, not even the dissenting opinion in *Venner* supports the intervenors' position.[23]

In sum, none of the decisions of this Court relied on by the Attorney General and MCL considered the reasonableness of underlying projects a material inquiry in a securities issue proceeding.[24]

## D

The Attorney General and MCL direct our attention to utility securities statutes of other jurisdictions. Some appear too dissimilar to illuminate the meaning of the Michigan act, and others contain language given diverse interpretations.

The Attorney General and MCL assert that the

[22] The New York Central Railroad had been investing in real estate in New York, including the Hotel Biltmore and several office buildings, and also had advanced $1,450,000 to a realty company "engaged in buying and selling New York city real estate". 205 Mich 579.

[23] The majority in *Venner* adopted a broader reading of the utility securities act, holding that the commission had the power to authorize stock that would capitalize expenditures previously made.

[24] Nor is *Detroit Edison v Public Service Comm*, 359 Mich 137; 101 NW2d 273 (1960), in point. There, this Court held that a utility's "guaranty contract" was a "security" subject to the requirements of the utility securities act.

New York and Michigan laws are substantially similar, but two dissimilarities militate against looking to the New York statute for guidance in the construction of the Michigan act. First, the New York Public Service Law includes a siting statute expressly requiring that no gas or electrical corporation begin construction of a plant without prior approval by the appropriate commission.[25] The New York Court of Appeals concluded that the siting and the securities issue provisions, in combination, indicated that the Legislature did not intend a securities issue to be authorized until a gas or electrical corporation's right to acquire property and to construct a plant became "certain and complete".[26] Second, the New York statute does not provide, as does the Michigan act, that commission approval of a securities issue does not "presume" the subsequent inclusion in the utility's rate base of the properties acquired or projects constructed with the proceeds of the issue.[27]

The New Jersey Supreme Court construed the term "purpose"[28] broadly to reflect its perception

[25] Public Service Law, § 68; see also art VIII, §§ 140-149-a, entitled Siting of Major Steam Electric Generating Facilities.

[26] The Court held that the language of the securities statute "* * * establishes the conclusion that the commissions are not empowered to authorize the issue of securities upon the application of a corporation which has not received the permission and approval provided in [section] 68 * * *". *People ex rel New York Edison Co v Willcox*, 207 NY 86, 94; 100 NE 705, 707 (1912).

[27] The Michigan act provides:

"Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base." MCL 460.301(1); MSA 22.101(1).

[28] "In the construction of such legislation the principle is, of course, axiomatic that the existing mischief is the vital consideration to which attention must be directed, in order to ascertain the legislative mind. Therefore the word 'purpose' in this connection must be accorded a meaning which will enable the board to investigate not only the object of the proposed bond issue, but the conditions under which it is to be made, and the entire environment of the company with its antecedents, and the prospective opportunities it may encounter in

that the Legislature intended the Board of Public Utility Commissioners to approve "the very merits of the subject-matter itself from the standpoint of a wise public policy, which was to have for its [the legislation's] ultimate object the safeguarding of the public against ill-considered and reckless financial ventures * * *".[29] The New Jersey statute provides for approval of a securities issue when the board of public utility commissioners has determined "that such issue is to be made in accordance with law *and the purpose thereof is approved* by the board".[30] (Emphasis added.)

The Massachusetts statute provides that the department of public utilities shall approve a securities issue if "reasonably necessary for the purpose for which such [securities have] been authorized".[31] In a case where a utility sought to exchange preferred stock for common stock without transferring tangible assets or value, Massachusetts' highest court stated that protection against the evils of overcapitalization required the department to "determine whether the purposes themselves are reasonably necessary".[32] The Court construed the term "reasonably necessary" to mean:

---

view of its past history, to meet the financial demands that the proposed burden is likely to impose upon it." *Interstate Telephone & Telegraph Co v Board of Public Utility Comm'rs,* 84 NJL 184, 188; 86 A 363, 365 (1913).

[29] *Id.*

[30] NJ Stat Ann 48:3-9.

[31] "Gas and electric companies shall issue only such amount of stock and bonds, and of coupon notes and other evidences of indebtedness payable at periods of more than one year after the date thereof, *as the department may from time to time vote is reasonably necessary for the purpose for which such issue of stock, bonds, coupon notes or other evidences of indebtedness has been authorized.* The department may take into consideration any resources of the companies available or which might have been available for said purpose." Mass Ann Laws, c 164, § 14 (emphasis added).

[32] *Lowell Gas Light Co v Dep't of Public Utilities,* 319 Mass 46, 52; 64 NE2d 640, 643 (1946).

"[r]easonably necessary for the accomplishment of some purpose having to do with the obligations of the company to the public and its ability to carry out those obligations with the greatest possible efficiency."[33]

It is again relevant that the words "reasonably required for the purposes" do not stand alone in the Michigan act.

Where a securities issue statute employs the term "corporate purpose", both broad and narrow interpretations have been adopted. The Oklahoma public service commission stated that approval of a securities issue "would be tantamount to" approval of construction plans and refused to grant such approval on a record which insufficiently demonstrated the necessity for a nuclear power plant in preliminary stages of construction.[34] The commission discerned a legislative intent that it examine the need for the plant before authorizing issuance of securities in light of the statute limiting securities issues to *proper* corporate purposes".[35] (Emphasis added.) The word "proper", in contrast with the word "lawful", can be read as meaning appropriate or necessary.

---

[33] *Id.,* p 52; 64 NE2d 644.

[34] *Re Public Service Co of Oklahoma,* No 26824 (Okla Corp Comm, 1980), appeal docketed *sub nom Public Service Co v State* (Sup Ct, 1981) (No 55147).

[35] "(1) A public utility organized under laws of this State may, when authorized by order of the Commission, and not otherwise, issue securities when necessary for the acquisition of property, the construction, extension or improvement of its facilities, or the improvement of its service, or for the discharge or lawful refunding of its obligations, or reimbursement of moneys actually expended from income from any source, or for any other corporate purpose authorized by the Commission. Such public utility may issue securities for *proper corporation purposes* payable at periods of not more than twelve (12) months, without the consent of the Commission; but no such note, in whole or in part, shall be refunded by any issue of securities, with maturity date later than twelve (12) months from date of issue, without the consent of the Commission." Okla Stat 1971 § 184(1). (Emphasis supplied.)

The Wisconsin Supreme Court has more narrowly construed the term *"proper* corporate purposes".[36] (Emphasis added.) The Wisconsin regulatory scheme requires a utility to seek approval, under the siting statute, for proposed construction and a certificate of authority in a securities issue proceeding. The Wisconsin Supreme Court approved the public service commission's differentiation between a finding of "public convenience and necessity" under the siting statute and "proper corporate purposes" under the securities act.[37] The Court noted, in a case where utilities sought a declaratory judgment regarding the validity of securities authorized by the commission, that the commission's order directed that no proceeds be applied to construction as yet unapproved in a siting statute proceeding, refused to invalidate the securities, and concluded that the term "proper corporate purpose" extended to construction of a power plant.[38]

In other states, the statutes expressly require a determination of the public interest. For example, the Alabama regulatory scheme[39] charges its pub-

---

[36] "(1) No securities shall be issued by any public service corporation until it shall first have obtained from the commission, and recorded upon its books a certificate authorizing such issue *and the commission shall not authorize the issuance of securities for any purposes which are not proper corporate purposes, or in an amount greater than is reasonably necessary for such corporate purposes,* having in view the immediate requirements of the corporation and its prospective requirements over a reasonable period in the future, and other relevant considerations.

"(2) All securities issued in violation of any of the provisions of this chapter shall be void." Wis Stat Ann 184.03. (Emphasis added.)

[37] *State ex rel Wisconsin Electric Power Co v Bardwell,* 71 Wis 2d 718, 721-722, 724; 239 NW2d 78, 81, 85 (1976).

[38] The Court was confident that should approval for the proposed plant subsequently fail to materialize, the commission would appropriately channel funds generated by the securities issue.

[39] Ala Stat § 37-4-28 directs a utility to secure a certificate of convenience and necessity before any construction other than "ordinary extensions of existing systems in the usual course of business".

lic service commission with the duty of determining that the securities issue "is compatible with the public interest" and that the issue "will not impair [the utility's] ability to perform [its] service [to the public]".[40] On the ground that the commission has a statutory obligation to find a security issue compatible with the public interest, the Alabama Supreme Court approved a condition imposed by the commission.[41]

This survey of the course of adjudication in other jurisdictions indicates nothing more than that utility securities statutes are susceptible to expansive as well as to narrow statutory interpretations.

Unlike New York, Massachusetts,[42] and Wisconsin,[43] Michigan has no siting statute[44] and alone

[40] Ala Stat § 37-4-7.

[41] *Alabama Power Co v Alabama Public Service Comm,* 278 Ala 597, 601; 179 So 2d 725, 728 (1965).

See similar approval in dictum of a Florida public service commission rule mandating consideration of the compatibility of the issue with the public interest, pursuant to Fla Stat Ann § 366.04, as amended in 1980. *Ft Pierce Utilities Authority v Florida Public Service Comm,* 388 So 2d 1031 (Fla, 1981).

The Virginia State Corporation Commission has construed the term "reasonably necessary to carry out one or more of the purposes set forth in the application", and language in the Virginia securities act, Va Code § 56-61 (1981), empowering the commission to impose terms and conditions upon an authorized issue as obligating the commission to consider the public interest in a securities issue proceeding and to determine the reasonableness of the purpose for which a utility seeks to generate funds through securities. *Re Old Dominion Electric Cooperative,* 86 PUR (NS) 129, 134-136 (1950) (noting the long-standing commission practice of express reference or incorporation by reference of the public interest standard in orders relating to the issuance of securities.)

[42] Massachusetts added a siting statute, c 164, §§ 69G-69R, to its utility regulation scheme in 1973.

[43] Wis Stat Ann 196.491. The Chairman of the Wisconsin Public Service Commission noted that Wisconsin has joined California, Iowa and Maine in declaring a moratorium on applications for new nuclear power plant construction. Advance Plans for Construction, Wis Pub Serv Comm case no 05-EP-1, p 18 (Aug 17, 1978). See, generally, Allison, *Judging the Prudence of Constructing Nuclear Power Plants:*

among the jurisdictions surveyed declares in its utility securities act that commission approval of a securities issue does not presume inclusion of underlying projects in the rate base.[45]

The utility securities statutes in other states offer little guidance in construing the Michigan act. Those statutes and their construction by their courts do not persuade us to conclude that the commission has an obligation to investigate the reasonableness of proposed or ongoing construction projects in its review of a securities application.

III

The parties have buttressed their conflicting constructions of the utility securities act with different visions of the overall scheme of utility regulation. The commission and the utilities have, in our judgment, offered a more accurate picture of the regulatory system.

A

The Attorney General and MCL have challenged

_A Report to the Oklahoma Corporation Comm,_ 15 Tulsa LJ 262 (1979).

[44] Michigan requires a certificate of convenience and necessity where one utility seeks to provide service in an area where another utility already provides service. MCL 460.502; MSA 22.142. Such a requirement seeks to avoid unnecessary multiplication of companies and wasteful duplication of facilities. _Huron Portland Cement Co v Public Service Comm,_ 351 Mich 255; 88 NW2d 492 (1958).

The Michigan Legislature, through its Public Utility Reform Task Force, is now studying potential reform of the scope of inquiry. The task force is drafting siting legislation to be submitted to the Legislature in early 1982. The proposed Power Plant Certification Act would require that a utility obtain commission approval before beginning construction of a power plant. Under the bill, the commission would decide whether there is need for a new plant and whether the proposed type of power plant is superior to alternative methods of power generation.

[45] See fn 27, _supra._

the issuance of these securities on the ground that cost overruns and errors in recent load forecasts have rendered continued construction of the power plants unreasonable. Stating that there must be an opportunity for commission review of the need for these plants while they are still under construction, the Attorney General and MCL contend that the utility securities act requires such a review during a securities issue proceeding.

To demonstrate the need for review of ongoing construction in a securities issue proceeding, the Attorney General and MCL construct the following scenario. If the commission cannot review the need for these plants before they are completed, it may face a disastrous choice. If it should find that the completed plant is unnecessary and should never have been built, the commission must exclude the cost of the plant from the utility's rate base. While completed projects have been excluded from the rate base, these plants represent costs of unprecedented magnitude: the Midland plant's cost is now estimated at $3.1 billion and Fermi 2's cost at $2 billion. A decision by the commission to exclude a multi-billion-dollar power plant from the rate base would put the utility in severe financial straits, possibly even bankruptcy. Faced with such catastrophic consequences, the commission would be under pressure to include an unnecessary power plant in the rate base. Such inclusion would violate the commission's statutory mandate to prescribe rates based on actual public need and would force Michigan ratepayers to subsidize the utility's multi-billion-dollar mistake.

The intervenors' assumption that the utility securities act provides the only means of inquiry into the reasonableness of plants during construction is inaccurate. At least two statutory methods,

other than a securities issue proceeding, provide an opportunity for review of the ongoing construction of a power plant.

The commission holds lengthy rate hearings under the transmission act,[46] approximately every year, during which it evaluates ongoing construction. In requesting a rate increase, a utility must file with the commission a detailed report of its construction projects.[47] In addition, the utility can request that Construction Work in Progress (CWIP) be included in the rate base.[48] If, during a rate proceeding, the commission finds continued construction of a power plant unreasonable, it can exclude the cost of unjustified construction from CWIP. The commission has employed this method of review. In a 1977 rate proceeding involving Detroit Edison, PIRGIM (Public Interest Research Group in Michigan) challenged Edison's continued construction of nuclear power plants as unreasonable and asked the commission to exclude the costs of their construction from CWIP. The commission considered the challenge on its merits and indicated that it was not persuaded that the costs of Edison's nuclear construction programs should be excluded from the rate base.[49]

Admittedly, a rate hearing does not allow review of the necessity of a plant unless the utility seeks to have the plant's costs included in the rate base. While review under the transmission act may be belated, that does not make the utilities securities act an appropriate means for pre-construction review.

---

[46] MCL 460.552; MSA 22.152.

[47] *Re Standard Filing Requirements,* case no U-4771 (May 10, 1976).

[48] See General Application for Change in Utility Rates, Schedule B1, Supplemental Appendix of Defendant-Appellee Detroit Edison, p 3626.

[49] *Re Detroit Edison Co,* case no U-5108 (May 27, 1977).

Moreover, the commission, in exercise of its supervisory powers, set forth in the general enabling act,[50] may conduct pre-construction review without regard to whether the utility seeks to have the plant's costs included in the rate base. The general enabling act creating the commission directs it to conduct an investigation "[u]pon complaint in writing that any rate, classification, regulation or practice charged, made, or observed by any public utility is unjust, inaccurate, or improper, to the prejudice of the complainant * * *".[51] In its rules prescribing the contents and kinds of complaints, the commission authorizes a "person", *i.e.,* "an individual, partnership, corporation, association, body politic, or state agency",[52] or the commission itself to challenge "unreasonable acts" of a public utility.[53]

The core of the intervenors' argument is that a securities issue proceeding provides an appropriate and perhaps the only forum for review of the construction of the plants in question before their completion. However, both the investigation procedure outlined in the general enabling act and a rate hearing under the transmission act provide an opportunity for commission review of the wisdom and reasonableness of plants during construction.

---

[50] MCL 460.58; MSA 22.8.

[51] MCL 460.58; MSA 22.8.

[52] 1979 AC, R 460.11(d).

[53] "Rule 21. (1) A complaint shall be limited to matters involving alleged unlawful or *unreasonable acts, practices* or omissions of a utility or carrier. A complaint may be either formal or informal and may be made by *a person having good or sufficient reason therefor* or by the commission on its own motion.

"(2) An informal complaint shall be in writing and signed by complainant, and contain a concise statement of the facts involved and the name and address of the complainant and the party complained against. The commission will attempt to settle problems arising under an informal complaint without formal action when possible." 1979 AC, R 460.31 (emphasis added).

Detroit Edison concedes that the commission can, under the transmission act, inquire into the reasonableness of continued construction of these plants.

## B

The utility securities act does not require a utility to secure commission approval before obtaining short-term credit.[54] A utility could thus complete considerable preliminary and construction work on a plant, financed by short-term debt, without filing an application under that act. Only when the utility decided to convert to long-term financing would the commission have an opportunity, under the utility securities act as the Attorney General and MCL would construe it, to review the decision to build a plant.

The purely financial decision to convert short-term debt into long-term securities bears no necessary relation to the construction of a new power plant or to regulatory review of a utility's decision to construct a new plant.[55]

In the instant case, the utilities planned to utilize a substantial part of the funds sought to be raised to retire maturing debt. The money thus had already been spent. Halting the rollover of existing debt while the commission ponders whether the money was wisely expended serves no apparent purpose and may raise the utility's interest costs.

Implicit in a regulatory scheme which permits a

[54] MCL 460.301(4); MSA 22.101(4). The Attorney General states that the total amount of a utility's short-term credit is regulated by the Federal Energy Regulatory Commission (FERC).

[55] Difficulties in rolling over short-term debt might exert some restraint on the availability or cost of short-term debt. But such control by the commission of the amount of short-term debt would be haphazard at best.

utility to borrow large amounts of money on a short-term basis and to roll over and add to short-term debt until the *utility decides* to refinance short-term debt with long-term is the concept that regulatory review is limited to the financial aspects of the refinancing and does not extend to a review of decisions that cannot be recalled (money already spent) or to decisions which, but for the financing, would not be subject to regulatory review (projects that were or could be initially financed with short-term debt).

## C

An inquiry into the underlying projects would require extended investigation, lengthy hearings, and careful consideration by the commission. Long delays are inappropriate in a securities issue proceeding. The utility's decision to issue securities, its determination of the optimal combination of securities to be issued, and the commission's review of those decisions all are premised on the conditions prevailing in the financial markets at the time the utility decides to seek additional financing. If there is a long delay between the utility's decision and the actual issuance of the securities, conditions in the financial markets may change considerably. A propitious time to issue securities may be lost, and the utility's evaluation of the best combination of securities and the commission's review, along with any appeals, are outdated.

An appellate court reviewing a commission decision in a securities issue proceeding may feel constrained to stay the order authorizing a securities issue until it is satisfied that the commission acted properly, because the securities, once issued, may become valid obligations that the utility can-

not withdraw. Such a stay would generally remain in effect until the parties have exhausted appeals. A protracted commission hearing on the merits of underlying projects, or a stay of an order authorizing issuance of securities, might arrest any construction and, therefore, does not preserve the status quo.

A rate hearing under the transmission act or an investigation upon complaint under the general enabling act provides an adequate method for questioning the continued construction of a power plant, and in such a hearing or an investigation ongoing construction need not be disturbed and thus the status quo can be preserved.[56] It is unnecessary and inappropriate to hold the financing hostage while the necessity of the plants is fully and carefully considered.

Finally, the issuance of securities without commission determination that the proceeds will be spent wisely does not leave the purchasers of securities deceived in any way. Aware that the cost of these plants may be excluded, in whole or in part, from the rate base, the market discounts the price of the securities to reflect this risk.

Protracting a securities issue proceeding provides no additional protection to the ratepayers. It disturbs the financing program, makes it difficult to refinance maturing debt, and simply pushes capital costs, which are paid by the ratepayers,[57] still higher.

---

[56] The commission can grant a temporary rate increase for which it can later compensate ratepayers, should that decision prove incorrect, by a reduction in subsequent rates. Even if the commission grants no temporary rate increase, the utility can continue to charge the old rates, thus preserving the status quo.

[57] The ratepayers are *already* paying for the completion of these plants, by subsidizing the higher capital costs that reflect the capital markets' estimate of the risk that these plants, if and when completed, will not be included in the rate base.

## IV

It may be wise, in this era of multi-billion-dollar power plants, for the commission to pass upon the necessity for any such plant before construction begins. The policy question whether the commission should be required to approve the construction of additional generating capacity before construction begins is properly for the Legislature, and not this Court, to decide.

We cannot confidently predict that the Legislature would today conclude that the reasonableness of a utility construction project should be made the subject of a pre-construction hearing.[58] The Legislature might conclude that the public interest is better served by the present system which requires a utility, its shareholders and bondholders to shoulder the responsibility and risk involved in deciding to construct additional generating capacity.

Pre-construction review and approval might saddle ratepayers with the cost of erroneous business decisions in which the commission, under the proposed regulatory scheme, will have participated. If whatever the commission approves in advance would assuredly or even probably become part of the rate base, advance approval might absolve the company from error in deciding to construct addi-

---

[58] This regulatory scheme was devised in 1909, long before the nuclear/fossil power debate, and at a time when the cost of constructing new generating capacity, in absolute or comparative terms, was far less than it is today. It was also a time when generating plants and other utility facilities could be constructed in a relatively short period of time.

If the construction of the act advocated by the Attorney General and MCL were adopted, the scope of inquiry upon issuance of long-term securities would or could include whether particular railroad tracks should have been laid or electrical or other lines or mains installed, as well as whether additional generating facilities should have been constructed.

tional generating capacity. A utility might then be inclined to err on the side of constructing additional generating capacity because it is less likely to be subject to criticism for having inadequate capacity, and the ratepayers will pick up the bill if there is excess capacity.

Contrariwise, if the corollary of commission approval is that an underlying project becomes part of the rate base, the commission may bar the construction of additional generating capacity lest it be charged with unnecessarily adding to the rate base and the cost of power.

In a word, the Legislature may conclude that the present regulatory scheme is more consonant with the concept of a private public utility system subject to public regulation than a scheme *requiring* the regulatory agency to prognosticate future energy needs and to assess the relative advantages and disadvantages of the means by which to meet these needs.

Under the present regulatory scheme, the utilities may indeed be betting the company on the wisdom of their decisions to build nuclear generating plants costing several billion dollars. If they have made erroneous decisions and the cost of the additional generating capacity is not included, in whole or in part, in the rate base, stockholders or bondholders or both would lose, but the ratepayers would be largely unaffected.

V

The separate opinion would require feasibility review by the commission of a new construction project upon the initial application for the issuance of long-term securities but not upon subsequent applications in respect to ongoing construc-

tion. It makes two arguments in support of that construction.

—The separate opinion reflects the view of the commission, which has "changed its position". There is, however, no adequate basis for the conclusions that the commission has adopted the view advanced in the separate opinion or changed to that position.

—A determination of the feasibility of a new construction project, upon an initial application for the issuance of securities, is necessary to achieve the "aims of regulation" which are to protect ratepayers and investors. Initial feasibility review would not, however, have protected ratepayers or investors in the instant case against the cost overruns caused by technological changes, regulatory restrictions and inflationary spirals following the commencement of construction of these power plants.

### (1)

The separate opinion states that, while the commission initially took the position that there was no need for it to inquire regarding the need for an additional power plant, "regardless of whether the requested securities were to finance new construction or ongoing construction", "the commission has modified its position somewhat. It now concedes that before approval of the initial issue of securities, a thorough and complete examination into the necessity of the construction of generating plants is appropriate".[59]

---

[59] The separate opinion also states:

"(4) The MPSC has *changed its position* on whether a determination of need and cost-effectiveness ever has to be made under the securities act from denying such a determination had to be made to *stating such a determination had to be made* but only in connection with approval of the first securities application.

"(5) The MPSC has recognized that a securities act proceeding

That statement is based in part upon a sentence in the brief of counsel for the commission in the *Consumers Power* case:

"A thorough and complete inquiry by the commission into the necessity of the initial issue of securities for the construction of generating facilities is appropriate."

While lawyers often make concessions binding on their clients in particular litigation, the views of a lawyer representing a regulatory commission should not be accepted by this Court as an authoritative construction by an agency charged with the administration of an act. The authoritative statement of the views of the commission regarding its concept of the meaning of the utility securities act is to be found in its decisions and opinions.

The commission's view, as set forth in its decision in *Consumers Power,* is that the commission has discretion to determine the scope of the inquiry.[60]

---

concerns not only overcapitalization but also service at reasonable rates.

\* \* \*

"We have observed that there are essentially three types of protection in question: complete feasibility investigations, first, at the original financing application; second, at subsequent financing applications; and third at rate proceedings. \* \* \* The MPSC contends the answer is yes in the first instance but no in the second. \* \* \* We hold such an examination is required at the original financing application but normally not at subsequent ones." (Emphasis supplied.)

The separate opinion concludes:

"We hold that the Legislature intended that (1) a complete feasibility examination should be made by the MPSC in connection with approval of the original application for securities, (2) upon subsequent applications it would suffice that the MPSC consider whether the statutory requirements were met with respect to the work to be next undertaken, and (3) a complete feasibility examination should be undertaken in connection with inclusion of the project in the rate base."

[60] "The commission must determine on a case by case basis whether certain issues are relevant to making the determination that the statutory requirements have been met because the issue raised in

The statement of the commission's counsel in *Consumers Power* that an inquiry into the necessity of an initial issue of securities for the construction of additional generating facilities is "appropriate", is entirely consistent with the concept advanced by the commission that it has discretion regarding the scope of the inquiry. It is one thing to say that it is "appropriate" to make an inquiry into the necessity of an initial issue of securities and quite another to say that such inquiry *must* be made. The statement of counsel for the commission may be read as simply saying that the commission, in the exercise of discretion, could appropriately make such inquiry; it need not be read as saying that such inquiry must be made by the commission.

While the commission's explanation for the manner in which it exercised discretion in *Consumers Power* was related to the circumstance that the Midland plant is "ongoing construction", that explanation cannot properly be read, as does the separate opinion, as implying that "a determination of need and cost-effectiveness" "had to be made but only in connection with approval of the first securities application". The opinion of the commission nowhere states affirmatively that such a determination *must* be made in connection with an initial application for the issuance of long-term securities for new construction. Moreover, such a

securities proceedings vary and the application of funds from the issuance of securities varies for different utilities. The Legislature did not restrict the commission's *exercise of discretion* because it recognized that conditions would vary with different utilities and different properties and therefore vested the commission *with extremely broad discretion to determine the relevant issues in securities proceedings."* (Emphasis supplied.) *Re Consumers Power Co,* case no U-6360, p 19 (Aug 4, 1981).

We have expressed our disagreement with the commission's view that it has discretion to determine the materiality of issues in a securities issue proceeding. See Part IIB.

reading of the explanation advanced by the commission in support of its decision to refrain, in the exercise of its discretion, from making such an inquiry in *Consumers Power* is inconsistent with the subsequent statement of the commission, on July 7, 1981, in *Edison II* that "[e]vidence relating to electric load forecasting and generating plant alternatives is irrelevant and immaterial in carrying out the intent of 1909 PA 144 [the utility securities act]".

Such a reading is also inconsistent with the commission's reasoning in *Consumers Power:*

"The commission also finds that the issue of cost-effectiveness as raised by the intervenors is not synonymous with the issue of overcapitalization with regard to ongoing construction projects and therefore examination of cost-effectiveness in a securities proceeding does not necessarily further the purpose of the securities act to protect against overcapitalization."[61] *Re Consumers*

[61] The decision and opinion goes on:

"Carrying the intervenors' argument to its logical conclusion, the intervenors are urging this commission to accept the view that overcapitalization will never occur if the least costly plant is built and that conversely, overcapitalization will always occur if the more costly plant (as compared to an alternative plant) is built. *This commission does not believe that this cost comparison approach to overcapitalization comes within the concept of overcapitalization as defined by the Supreme Court since it does not attempt to correlate the liabilities of the applicant with its assets. The commission, therefore, is not persuaded that the intervenors have raised a valid claim of overcapitalization with respect to the Midland plant by their contention regarding cost-effectiveness.*

"The intervenors' dispute of applicant's estimated cost of completion and operation of the Midland plant is central to their position that the Midland plant is not cost-effective. *Insofar as the evidence regarding the ultimate cost of construction is tied to the issue of cost-effectiveness, the commission does not find this evidence relevant to a determination in this proceeding for the reasons set forth with respect to cost-effectiveness.* In addition, insofar as the ultimate cost of construction raises the issue of the reasonableness of expenditures made in constructing the Midland plant, the commission points out that alleged cost overruns in the construction of the Midland plant *should be dealt with in the ratemaking proceedings or in other* proceedings *specifically designed to address utility construction programs.*

*Power Co,* case no U-6360, p 23 (Aug 4, 1981).

Since the statement of counsel for the commis-

"The language of the securities act unambiguously provides that approval of securities for construction projects does not bind this commission to include the total cost of that project in that company's rate base. The commission points out that in case no U-4717 the commission disallowed the inclusion of a certain portion of the cost of the Marysville Synthetic Natural Gas Plant in the rate base of the company although the commission had previously authorized the issuance of securities to fund construction of that plant. Since the securities act and the commission decision in U-4717 make clear that applicant proceeds at own risk, for ratemaking purposes, in constructing a plant, it is not appropriate for this commission to continually reexamine in securities proceedings, changes in the estimated costs of construction of an ongoing construction project once the commission has approved the issuance of securities for the initial construction of the project. Adequate *protection against unreasonable and imprudent expenditures by the applicant is provided by the statutory provisions governing the setting of rates for that applicant.* The commission does not feel that the Legislature intended to provide the same protection for the ratepayers under the rate setting statutes and securities act. In giving the commission the discretion to determine the scope of inquiry or investigation in securities proceedings the commission believes the Legislature intended to permit the commission to reach determinations on securities applications in the most efficient manner possible in order to meet effectively the financing needs of a utility.

"The commission notes that power plant siting legislation has been previously introduced in the state Legislature addressing the problems presented by changing demands for electricity, rising construction costs, environmental regulations, and other factors relating to the construction of power plants. If circumstances have changed during the past several years so that additional protection should be provided against imprudent or unreasonable management decisions relating to the construction of power plants, the commission feels that power plant siting proceedings, and not securities proceedings, are the appropriate forum for examining those issues.

"Finally in connection with the ultimate cost of construction of the Midland plant, the commission wishes to emphasize that past securities orders involving the Midland plant have not in any way inherently approved the reasonableness of the applicant's expenditures in constructing the Midland plant during the various phases of construction. In approving the initial issues of securities for purposes of constructing Midland, the commission inherently found that the construction of Midland was a lawful purpose and that the plant was reasonably required for the purposes of the applicant. Subsequent authorizations for funding of continued construction found that the amount of funds requested for continued construction were essential for the purposes of continuing construction at the Midland plant but in no way did it give a stamp of approval to the expenditures made for Midland." *Id.,* pp 24-26.

sion can be read as consistent with the view expressed by the commission that it has discretion, there is no adequate basis for concluding—especially in light of the other rationale in *Consumers Power* and the subsequent statement of the commission in *Edison II*—that the commission has "changed its position" or has adopted the construction of the utility securities act advanced in the separate opinion.

(2)

The separate opinion states that the language of the utility securities act—"purposes" of a utility and "reasonably required"—must be construed consonant with and in the context of the "aims of regulation" and that those aims are utilities providing "adequate services at reasonable rates and earning reasonable profits". The separate opinion continues that, since those are the aims of regulation, the commission cannot approve a securities issue for an additional power plant without determining that the additional plant is feasible and will provide adequate service at a reasonable rate and earning a reasonable profit.[62]

---

[62] The separate opinion concludes:

"[T]he Legislature, by requiring securities to be reasonably required for the purpose of the applying utility, expected the MPSC to balance the interests of investors and ratepayers along with the interests of the utility *before* the original securities are issued to finance the construction of electric plants. * * *

"This balance will be achieved if the MPSC makes a complete feasibility examination at the time of the original application for financing and later evaluates the costs of the project when the utility requests inclusion in the rate base. Thus, we do not believe that the legislative intent was to allow a utility's investors to invest billions of dollars into a facility that the MPSC claims will be evaluated for viability at the time a company requests inclusion of the costs of such facility in its rate base. Such a result would be inherently unfair to investors, the utility and its ratepayers. Moreover, this approach implies that a utility can proceed at its own risk even *though the* costs of construction may ultimately leave the utility impoverished and the ratepayers with an unwontedly swollen rate base. * * *

If the "aims of regulation" impose upon the commission the duty, as part of a securities issue proceeding, to determine the feasibility of additional power plants to assure adequate service at a reasonable rate with a reasonable return, then that rationale should require such review upon each application for a securities issue, as well as upon the initial application.

An initial determination of the feasibility of these nuclear and the other challenged power plants would not have provided protection either to ratepayers or investors.

The separate opinion states that the Midland plant was announced in 1967:

"Originally the plant was to be completed by 1974-1975 at a cost of $370 million. It is not near completion, however, but Consumers Power anticipates completion by 1984-1985. The current construction costs which have been subject to tremendous inflationary pressures and additional safety engineering costs are now set at $3.1 billion by Consumers Power and $3.5 billion or more by the staff of the MPSC."

The separate opinion states with regard to the Detroit Edison plants:

"The Fermi 2 plant has experienced 14 cost overruns since its construction began in 1969. Originally it was projected to cost $229 million, but in the last several years the cost estimates have multiplied to $1.8 billion. Moreover, the utility has acknowledged that it cannot guarantee against further cost overruns, and it admitted that the final costs of the plant may include an additional $200 million. Similarly, the Belle River units

"We agree with the commission, however, that in these particular cases it is too late in the day to make a *post hoc* examination about the need and cost-effectiveness of the plants." (Emphasis in original.)

have also experienced cost overruns. The most recent projected cost overrun was for $500 million."

Manifestly, initial feasibility review, 10 to 14 years ago, would not have protected ratepayers or investors from miscalculations of the magnitude described.

There is no basis for concluding that if the procedure advanced in the separate opinion had been in place 10 to 14 years ago, the Attorney General, the Michigan Citizens Lobby (if it had then existed), the commission staff, or anyone else, would have recognized that nuclear plants would cost ten times the estimates of the utilities and would take as long as they have to complete. There would have been the same lack of omniscience regarding load forecasting, alternative generating facilities and cost-effectiveness.

Since the history of the efforts to bring on line these additional generating facilities demonstrates that initial feasibility review may be no protection at all, if the utility securities act is construed, on the aims of regulation rationale, to require feasibility review, such review should be upon each application for the issuance of securities.

The commission and the separate opinion both recognize, however, that an ongoing construction project cannot be constantly interrupted by ongoing securities review. Every issue of securities cannot be subjected to the delays of a new feasibility study, hearings and appeals. As the commission states, and we hold, feasibility review should be in a proceeding separate from utility securities issuance either during the course of construction or, alternatively, in a rate proceeding following the completion of construction.

The assumption of the separate opinion that the

aims of regulation described in that opinion can only be achieved by feasibility review in a securities issue proceeding has not been demonstrated. Ratepayers can, in the main, be protected by review in a rate hearing following the completion of construction. As suggested in Part IV, ratepayers may even be better protected by a procedure which, as set forth in the decision and opinion of the commission in *Consumers Power,* requires the managers of the utilities to assume responsibility for commitments of this magnitude[63] and by a regulatory process which does not impose upon regulatory agencies an obligation of prognosticating 10 to 15 years or longer into the future.

It is apparent that Consumers Power and Detroit Edison have the capacity to borrow hundreds of millions of dollars on a short-term basis. They, therefore, have the capacity, without filing an application under the utility securities act, to complete preliminary work, commence construction and perhaps even complete a small plant or gener-

---

[63] "It is obvious that because of this state of flux, even a careful thorough assessment of the need for, and the cost-effectiveness of a particular power plant at one point in time, does not guarantee that the power plant will at its completion still be needed, or still be economical as compared to other generating alternatives. Thus the question becomes whether it is reasonable for this commission to examine the need for, and the cost-effectiveness of a power plant at several stages of construction, and thereby assume the *role of an overseer of management decisions* [emphasis supplied] in attempting to insure that, at its completion, the electricity generated by the power plant is needed to meet the demand for electricity and the plant is cost-effective in that its ultimate cost of completion is less than the cost for an alternative generating facility with the same capacity.

"The commission is convinced that it is not reasonable in the context of securities proceedings to examine the need for, and the cost-effectiveness of the power plant *once actual construction has commenced* [emphasis in original] and that such examination does not further the purpose of the securities act to protect against overcapitalization and serve the interest of customers in efficient and uninterrupted service at a reasonable rate." *Re Consumers Power Co,* case no U-6360, p 21 (Aug 4, 1981).

ating facility without going to the long-term market.

Because there is no need to file a securities application for short-term financing, initial feasibility review would often occur only after the plant had become "ongoing construction" or sometimes completed construction. The extent or timing of such initial feasibility review would thus often be at the option of the utility.

A construction of the act which makes the extent and timing of the proposed initial feasibility review dependent upon whether the utility seeks or needs long-term financing is not consistent with the argument that initial feasibility review of new construction projects is necessary to achieve the aims of regulation.

## VI

We do not now pass on the need for additional generating capacity or on the merits of fossil or nuclear power or of these particular plants. We hold only that a securities issue proceeding is not the proper method by which to raise those questions.

We affirm the orders of the commission authorizing the issuance of securities in *Edison I, Edison II* and *Consumers Power.* No costs.

COLEMAN, C.J., and KAVANAGH, RYAN, and FITZGERALD, JJ., concurred with LEVIN, J.

WILLIAMS, J. The basic issue in these cases is the amount of protection the Legislature intended to provide both utility investors and ratepayers through the Michigan Public Service Commission (hereinafter MPSC or commission) in the securities

act, MCL 460.301; MSA 22.101, and the transmission act, MCL 460.552; MSA 22.152.

There are essentially three types of protection in question. First, the MPSC can make a thorough investigation into the need and cost effectiveness of the utility project, in these cases electric power generating plants, in connection with the commission's determination whether or not to authorize "the issue and the amount of the issue" of the original utility application for securities to develop such a project. Second, the MPSC can make such a thorough feasibility investigation each time a utility applies for subsequent financing for a project already investigated and approved instead of the more limited ascertainment that the additional financing is appropriate for the amount of ongoing work to be undertaken during that segment of the work. Third, the MPSC can undertake a thorough investigation into the need and cost-effectiveness of the utility project or a part thereof at the time the utility seeks to include the cost of the project or a part thereof in the utility's rate base.

The Attorney General and various intervenors with him take the position that the Legislature intends utility investors and ratepayers to have the complete advantage of all three types of protection, to wit, a complete MPSC feasibility examination on original application for project financing by the utility, a similar complete MPSC feasibility examination on each and every subsequent financing application, and finally such an MPSC examination when the utility seeks to enter the cost of the project or a part thereof into the rate base.

The MPSC takes the position, after long and eye-opening experience, that the Legislature intends utility investors and ratepayers to have the complete protection of the first and third types of

protection and the more limited protection of the second type. In other words, the MPSC will undertake complete feasibility examination at the time of original application for financing and at the time of consideration of the cost of the project or a part thereof for inclusion in the rate base. At the time of requests for approval of subsequent financing, the MPSC would not undertake a complete feasibility examination, but would only determine whether the financing requested was necessary for the next step of the ongoing project.

The utility defendants take a position somewhat short of the MPSC. They do not consider directly whether the Legislature intended the first type of protection, but insist that in this case the MPSC has provided such protection by actually making such a comprehensive feasibility examination. They insist, like the MPSC, that a complete MPSC feasibility examination is not called for on subsequent financing applications for ongoing projects. They acknowledge that the third type of protection requires a complete feasibility examination.

Our brother Levin's opinion takes a position short of both the MPSC and defendant utilities. He finds legislative intention for the protection of complete feasibility examination only at the third stage, ratemaking, and finds no legislative intention for complete feasibility examination protection in connection with securities act financing.

The position of this opinion is similar to that of the MPSC. We believe the Legislature contemplated the protection of complete feasibility examination both at the time of original financing application and at the time of ratemaking. At the time of subsequent financing application a complete feasibility examination is not necessary and the more limited determination of the necessity of the

financing for the next stage of ongoing construction is adequate.

Our opinion that the Legislature intended complete feasibility examination at the time of original financing application is based both on construction of the language of the statute and consideration of policy implications. In construing the statute we found the phrase "property * * * reasonably required for the purposes of the * * * corporation", MCL 460.301(1); MSA 22.101(1), of particular significance. We found that the "purposes of the * * * corporation" necessarily contemplated, under the regulatory scheme, the problem of adequate services by a healthy utility making a reasonable return to consumers at reasonable rates. Therefore, since the statute required the commission to state "that in the opinion of the commission the use of the * * * property * * * is reasonably required for the purposes of the * * * corporation,. the MPSC would necessarily have to make a complete feasibility examination. Without making such an examination, the MPSC would not have the information on which to base such an opinion.

The caveat that such approval does not presume inclusion in the company's rate base (MCL 460.301; MSA 22.101) is perfectly legitimate advice to one and all based on the possibility of occurrences subsequent to approval of the original financing application and prior to actual consideration of incorporation in the rate base. While this provision is some indication that the commission's feasibility study at the time of application for original financing is not definitive as to incorporation in the rate base, it by no means negatives the requirement that the financing be for lawful purposes.

In addition to statutory construction, we believe public policy dictates the conclusion we have reached. We are convinced that the whole policy of utility regulation is to ensure consumers adequate service at reasonable rates through the maintenance of financially healthy utilities supported by such reasonable rates. This policy scheme would be subverted by failing to make a complete feasibility investigation at the initial financing application. If there were no such examination, a utility might consciously or unconsciously embark upon a major and enormously costly project that was not needed or not cost-effective. By the time of determination whether the cost of the project should be included in the rate base, which could be years later, the MPSC would be confronted with an impossible dilemma.[1] On the one hand, if it included all or the major portion of the cost in the rate base, the rate base would be so swollen as to make rates prohibitively expensive and an unwarranted economic burden on the ratepayer.[2] On the other hand, if such costs were not included in the rate base, the financial well-being of the utility might be disastrously affected to the serious detri-

---

[1] In MPSC case no U-5331, an electric rate proceeding, the MPSC implicitly recognized the horrendous problems of a 10 year late feasibility study. An intervenor argued among other things that Midland was unnecessary to meet future power requirements. MPSC's order stated in part:

"* * * Moreover, the forced abandonment of all of the Midland plant would be a financial disaster for applicant and would seriously compromise applicant's ability to finance any additional construction, including coal-fired and cogeneration facilities. Finally, to the extent that the financial community perceived the commission as acting irresponsibly by enforcing the abandonment of the total Midland project, all other utilities in Michigan would have increased difficulty in financing their construction projects."

[2] For example, Commissioner Anderson, in her dissent, states: "Staff figures indicate rate increases of 20% to 25% or more of the then current rates will be necessary when the Midland plant became operational. Such increases are devastating."

ment of its investors and creditors. Furthermore, such economic catastrophe to the utility would not leave the ratepayer unscathed. The least that could happen to the ratepayer would be increased rate payments, because the catastrophe would so lower the credit-worthiness of the utility that the cost of money would inevitably affect utility costs and rates. What is more, the lower credit-worthiness and cost efficiency of the utility could very well affect the level or the extent of utility services, or both. In other words, if protective steps are not taken at the outset, it can become impossible at the rate-fixing time to act to prevent insupportable economic burdens for both the investors and the ratepayers. We cannot believe that the Legislature contemplated this possibility.

At the same time, the decision of not also requiring a complete feasibility examination at each subsequent financing application is logically supportable in law and public policy. To begin with, the complete feasibility examination in connection with the original financing application would, under normal circumstances, provide the MPSC with a reasonable basis for judgment of the appropriateness of subsequent financing with investigation only of the reasonableness of the financing for the next work stage in the ongoing development of the project. On the other hand, the delay and business implications of another complete feasibility examination might very well, as it did in these cases, jeopardize the ability to market securities in a fast-moving and inherently suspicious market atmosphere.

These policy and logical factors reinforce the correctness of our legal interpretation of the statutory schemes as set out above. No one challenges the necessity of the third type of protection, a

complete feasibility examination at the time of incorporation of project costs into the rate base.

Under our interpretation of this provision, we hold that the MPSC must make a thorough inquiry of need and cost-effectiveness of a plant and the amount of capital necessary to accomplish the construction when the initial issuance of securities for the construction of that plant is requested by a utility. Moreover, if the commission authorizes the securities after such a determination, when approval for additional securities is requested, a redetermination should not be needed in most cases. Under the facts of the instant case, we do not believe that an inquiry of need and cost-effectiveness is necessary.

We also hold that the operative statutory standard indicates that such a determination should be made by the MPSC as specific findings of fact. We are supported in our statutory interpretation by the objectives of the statute which are to protect both investors and ratepayers of a utility.

Finally, we believe that once the initial determination at the initial security request is made and the securities are authorized for this purpose, additional protection against unreasonable and imprudent expenditures by a utility is provided in the statutory provisions governing the setting of rates.

## I. FACTS (CONSUMERS POWER COMPANY)

### A. MPSC Case No U-6360 Proceedings

The issues in the instant appeal arise from complicated administrative and judicial proceedings. The Attorney General and the Michigan Citizens Lobby (MCL) have requested an indefinite stay to prevent the issuance of securities by Con-

sumers Power Company which was authorized by the MPSC on August 4, 1981 in security case no U-6360. The opinion and order of the MPSC authorized the total financing of $363 million through the sale of various types of securities, presumably needed to finance the construction of the Midland plant.

In the administrative proceedings before the commission, the Attorney General and the MCL intervened[3] and offered in opposition to the requested securities issuance evidence which indicated that the Midland plant was not cost-effective as it would be less costly to build two coal-fired generating plants and that the company's forecasting of future energy demand was inaccurate. Although this evidence was presented before the MPSC, the commission ruled in its opinion and order of August 4, 1981 that this evidence was irrelevant in a subsequent securities application because once securities have been approved for actual construction, the need to examine the cost-effectiveness of a power plant does not further the purpose of the securities act. MCL 460.301; MSA 22.101. Specifically, it ruled that once construction has begun a determination of need and cost-effectiveness (1) increases the risk of investment in the construction project which then increases the cost of capital; (2) creates extended proceedings which burdens the commission in meeting its statutory responsibility of making a determination on each securities application that comes before it; (3) "is not synonymous with the issue of over-capitalization with regard to ongoing construction projects"; and (4) is not proper in a security case to control alleged cost overruns which should be dealt with

[3] Under MCL 460.301(2); MSA 22.101(2), an interested person "shall have the right to intervene as provided by the rules of the commission".

in ratemaking proceedings or in other proceedings specially designed to address utility construction programs.

On August 24, 1981, the intervenors filed an emergency motion for a stay and an emergency appeal with the Michigan Court of Appeals. On September 14, 1981, the Court of Appeals granted the application for leave to appeal but denied the stay. *Id.*

On September 15, 1981, the intervenors filed an emergency motion for a stay with this Court. *Id.* On the same day, we issued an order staying the Court of Appeals proceeding and bypassing that Court. 411 Mich 1064 (1981).

*B. The Midland Plant Construction*

The plans for the Midland plant were announced in 1967 by Consumers Power Company. As of today, it has been almost 14 years since the site outside the city limits of Midland was chosen. Since its inception, it has been plagued by much controversy at the state and federal levels.

Originally the plant was to be completed by 1974-1975 at a cost of $370 million. It is not near completion, however, but Consumers Power anticipates completion by 1984-1985. The current construction costs, which have been subject to tremendous inflationary pressures, and additional safety engineering costs are now set at $3.1 billion by Consumers Power and $3.5 billion or more by the staff of the MPSC. See MPSC security case no U-6360, dissent, p 2 (August 4, 1981) (Anderson, *dissenting).*

The "cost-plus construction" of Midland plant is an excellent example of the phenomenon that if anything can go wrong, it will. It has set records in long construction time and high expense. In addition, it is located in an urban center which

has forced the Nuclear Regulatory Commission to closely scrutinize and expand safety requirements amidst frequent public outcry. Moreover, the design of the nuclear units is substantially similar to the notorious Three-Mile Island units. MPSC case no U-6360, *supra,* dissent, p 4 (Consumers Power's Appendix, p 329b).

There have also been specific problems with soil erosion, underground caverns, and the ventilation systems. In addition, Consumers Power has been forced to conduct stress analyses on the reactor pipes which has impeded completion of the plant and increased its actual and projected costs.

In short, the projected costs of the Midland plant have increased 737% from $370 million to $3.1 billion. There have been approximately 11 years of construction which could easily escalate to 15 years before completion of the plant.

Moreover, energy needs were either not originally considered by MPSC or substantially overestimated, according to Commissioner Anderson. When the Midland units become operational in 1984, they will generate approximately 1,350 megawatts (mw) of electricity. In 1984 alone, Consumers expects an excess summer generating capacity of 35.4% (1,842 mw) and an excess winter capacity of 56.6% (2,323 mw). Moreover, in 1985, the excess capacity is estimated to be 38.3% (2,113 mw) for the summer and 50.1% (2,609 mw) for the winter season. MPSC case no U-6360, *supra,* dissent, p 5. Nevertheless, Consumers still maintains that this plant is needed because their energy forecasts indicate strong future energy demand. However, there is no record of commission consideration of this point in a securities case, although the staff of the MPSC generally considers a 20% reserve capacity as being desirable. MPSC case no U-6360,

*supra,* dissent, p 5. Moreover, justification for increased energy capacity is based on an assumption of increased energy usage and demand which is not taking place. This problem is further exacerbated by the fact that these excess reserves are resulting in a period of energy conservation.

In her dissent in case no U-6360, Commissioner Anderson stated after reviewing the procedural and construction history of the plant that:

"The point is the Michigan Public Service Commission majority does not examine these relevant issues before or during construction. Instead, it allows a utility company's investors to put millions or, as in this case, billions of dollars into facilities that it claims will be evaluated for viability at the time a company requests inclusion of such facilities in its rate base."

## II. FACTS (DETROIT EDISON)

### A. Edison I: MPSC Case No U-6217

On July 26, 1979, Detroit Edison filed an application with the MPSC requesting authorization to issue $625 million of long-term securities needed to finance the continued construction of the Fermi 2 nuclear generating plant, the Belle River coal-fired generating plants and the refunding of short-term and long-term debt. The commission issued a notice of inquiry which scheduled hearings to begin on September 12, 1979. The Attorney General and the Michigan Citizens Lobby (MCL) intervened, arguing and presenting evidence that the utility's forecasting of future energy needs was inaccurate; the utility's reserve energy capacity was too large; the nuclear plant was more expensive than coal-fired plants; and the cost overruns

of the Fermi 2 indicated that the plant was more expensive than the utility had acknowledged.

On April 1, 1980, the MPSC issued its opinion and order approving the application of the company. The commission, however, held that the evidence in opposition to the securities request was irrelevant and immaterial in carrying out the intent of the securities act. The intervenors then filed a delayed application for leave to appeal in the Court of Appeals which was denied on June 11, 1980. Later, they filed an application for leave to appeal in this Court and in lieu of granting leave we remanded the case to the Court of Appeals for consideration as if leave was granted. 411 Mich 903 (1981).

*B. Edison II: MPSC Case No U-6557*

On July 29, 1980, the utility once again filed an application seeking authority to issue up to $1.996 billion of securities needed to finance the continued construction of the power plants and to refund outstanding short-term and long-term debt. On August 22, 1980, the commission issued a notice of inquiry which scheduled hearings to commence on September 24, 1980. Once again the Attorney General and the MCL intervened, presenting evidence relating to the need and cost-effectiveness of the plants. On July 7, 1981, the commission authorized the issuance and held that evidence relating to electric load forecasting and generating plant alternatives was irrelevant and immaterial in carrying out the intent of the securities act.

On July 27, 1981, the intervenors filed in the Court of Appeals a claim of emergency appeal, an emergency complaint for an order of superintending control, an emergency application for leave to appeal and a motion for immediate consideration and stay of the order. The Court of Appeals issued

an order granting the motion for immediate consideration, application for leave to appeal and stay of the proceedings. On August 6, 1981, Detroit Edison filed an application for emergency leave to appeal and to vacate the stay in this Court. We denied leave on August 14, 1981. 411 Mich 1028 (1981).

While the Edison orders were being appealed, Consumers Power's securities order (MPSC case no U-6360) was being appealed to the Court of Appeals by the Attorney General. The Court of Appeals denied leave. The Attorney General immediately sought emergency relief from this Court, and on September 15, 1981, we granted a stay of the commission's order and bypass of the Court of Appeals. We also granted bypass on our own motion in *Edison II* and ordered all three cases consolidated for argument. 411 Mich 1063-1065 (1981).

We lifted the stay in *Edison II* and *Consumers Power* on October 16, 1981. 411 Mich 1064, 1065 (1981).

### C. The Fermi 2 and Belle River Plants

Although the Midland plant has been plagued by many more construction problems, the construction history of the Edison plants reflects a similar pattern under the regulatory supervision of the MPSC. Specifically, there are two coal-burning plants (Belle River units 1 and 2) and one nuclear plant (Fermi 2) where there are allegations of construction cost overruns, waste, and inaccurate energy demand forecasts.

The Fermi 2 plant has experienced 14 cost overruns since its construction began in 1969. Originally it was projected to cost $229 million, but in the last several years the cost estimates have multiplied to $1.8 billion. Moreover, the utility has

acknowledged that it cannot guarantee against further cost overruns, and it admitted that the final costs of the plant may include an additional $200 million. Similarly, the Belle River units have also experienced cost overruns. The most recent projected cost overrun was for $500 million. Like the Midland plant, there was no determination of feasibility by the commission on the record when the original securities to finance these plants were requested by Detroit Edison.

## III. CONTENTIONS OF THE PARTIES

Because of the difficulty in defining the issues in the instant case, a review of each party's position will clarify our analysis of the statutory requirements as they apply to security cases and to a lesser degree in rate order cases.

### A. Attorney General's Position

Basically, the Attorney General, in challenging the regulatory behavior of the MPSC, believes that under the securities act the MPSC must determine (1) that the plant or project financed by a securities issuance must be reasonably required as it relates to a utility's ability to render service in a cost-effective way; (2) that the amount of funds generated by the securities issue should be the approximate amount essential for the purpose of the utility; and (3) that the purposes for which the funds are used must be lawful—conform to applicable statutes and regulations. Thus, the Attorney General argues that:

"In order to determine whether a plant is 'reasonably required', and the amount spent on it 'essential', the commission must examine carefully the forecasted need for the plant's energy output. If forecasts show that a plant is unneeded to meet future demand, then investors

will suffer because the PSC cannot lawfully permit the plant to earn a return as part of the utility's 'rate base'. The alternative is to charge ratepayers for a plant they do not need."

Furthermore, the Attorney General believes that this determination must be made every time authorization to issue securities is requested by a utility.

For support of his position, he argues that this Court has construed the securities act as protecting not only the interest of investors from overcapitalization but also in protecting the interests of ratepayers by insuring efficient service at reasonable rates. *Indiana & Michigan Power Co v PSC,* 405 Mich 400, 410; 275 NW2d 450 (1979); *Michigan Gas Storage v PSC,* 405 Mich 376, 390; 275 NW2d 457 (1979). Moreover, he contends that other jurisdictions with similar acts have required proof of reasonableness, essentialness and lawfulness through load forecasting and cost-benefit analyses. *E.g., People v Willcox,* 207 NY 86; 100 NE 705, 706-707 (1912).

Under his analysis, the commission has violated its statutory mandate to make such determinations because it has ignored the forecasting evidence presented by intervenors in several securities cases. The reason that the MPSC has failed to consider such evidence is that it has consistently interpreted the act too narrowly when compared to its apparent legislative purpose.

In short, the Attorney General believes that the MPSC has routinely approved the reasonableness of Consumers' expenditures in constructing the Midland plant during its various phases.

*B. Michigan Public Service Commission's Position*

Initially, the MPSC took the position that under

the act it only had to determine, regardless of whether the requested securities were to finance new construction or ongoing construction, whether the issuance was necessary for construction of a plant which was reasonably required for the purpose of the utility. Secondly, it determined whether the funds generated by an issuance were to be applied for a lawful purpose. This means that the issue and the amount were essential to the successful carrying out of this purpose.

In response to the Attorney General's challenge of its regulatory behavior in security cases, the commission has modified its position somewhat. It now concedes that before approval of the initial issue of securities, a thorough and complete examination into the necessity of the construction of generating plants is appropriate. After approval of initial securities, however, MPSC believes re-examination is not necessary because of the time involved, the risk it would create for the investment community and the fact it would be duplicative.

The commission also disputes the case law which the Attorney General cites in support of his statutory interpretation. In addition, it finds support for its position by arguing that since proposed amendments to the act were not enacted by the Legislature, this Court should not interpret the language "reasonably required for the purpose of" a utility to include the objectives of siting legislation.

The MPSC also argues that in any event the determination argued for by the Attorney General has been made. It believes that it has considered the construction program of Consumers Power in 30 security cases since 1970. In approving the various security requests for purposes of constructing the plant, the MPSC argues that it found that the construction of the plant was lawful and that

it was reasonably required for the purposes of the utility. The continued authorizations of funding also indicated that the commission believed that the amount of funds requested was essential for the purposes of completing the plant.

Similarly, the MPSC contends that the examination requested by the Attorney General is not necessary as the construction program has also been considered in several ratemaking cases since 1970. In fact, the commission, in case no U-6360, stated that:

"Adequate protection against unreasonable and imprudent expenditures by the applicant is provided by the statutory provisions governing the setting of rates for that applicant. The commission does not feel that the Legislature intended to provide the same protection for the ratepayers under the rate setting statutes and securities act."

Thus, the MPSC believes that the securities act vests it with authority to authorize the issuance of securities after determining that the securities are reasonably required for the ongoing construction of a generating plant where already the commission has continually authorized the issuance of securities through the various phases of construction.

## C. Consumers Power

Consumers Power seems to argue even more strongly that the Midland plant had been considered in several rate cases. Implicitly, under its analysis, the fact that construction work in progress related to Midland was included in the rate base after being objected to by the Attorney General supports the notion that a re-examination does not have to be undertaken every time a

securities request is made. Edison made similar arguments.

## IV. A REVIEW OF THE SECURITIES AND RATE ORDERS DURING THE ONGOING CONSTRUCTION OF THE MIDLAND PLANT

Although the MPSC maintains that it has considered the feasibility of the construction program of the utility in several securities and rate orders which would have included the Midland plant, a review of these cases indicates, however, that on the record the commission has neither examined nor established the need, reasonableness and economic feasibility of this plant before or during construction. As Commissioner Anderson pointed out in her dissent in case no U-6360, the MPSC has not really addressed the problems of the Midland plant.

"What the majority [of the MPSC] fails to note is that *this* commission does not address these serious concerns at *any* time. Instead the majority states that the securities act does not bind it to include the total plant cost in the company's rate base. It thus implies that Consumers is proceeding at its own risk." (Emphasis in original.)

Moreover, the MPSC denies that it has followed a routine approval of reasonableness during the construction of the Midland plant. Our review of the past orders, however, indicates that the MPSC has, without adequate specific findings of fact to support the conclusions reached, approved the reasonableness of the utility's construction program every time that it has applied for the authorization to issue securities.

## *1. Securities Order Cases*

On March 8, 1968, after the plans for the Midland plant were announced in 1967, Consumers Power filed an application for authority to issue first mortgage bonds. In MPSC case no U-3050 (April 11, 1968), the commission granted the utility's $55,000,000 request. No specific statement that such funds were to be used for beginning construction of the Midland plant appears either in the application or in the order. At best a logical inference can be drawn from the timing of the request and order to indicate that a portion of the funds was to be used for the construction of the new Midland plant.

The MPSC made the following findings of facts in its order:

(1) The utility proposed to make capital expenditures in the year 1968 amounting to approximately $194,394,-100. Included in this total was the amount of $958,000 relating to the Ludington Pumped Storage Generating Plant.

(2) "The expenditures set forth [by Consumers in its application] were and are necessary for the acquisition of property, the construction, completion, extension or improvement of facilities, or for the improvement or maintenance of service."

(3) The funds were for the above purpose and also for the discharge or lawful refunding of obligations.

(4) The funds are to be applied to a lawful corporate purpose, the issue is "essential" for such purpose and is reasonably required for the purposes of the company.

From these conclusory findings developed solely from data Consumers supplied in its application, the MPSC authorized the issuance of these bonds without an indication for what specific projects the funds would be used.

In addition, MPSC authorized this security issuance without considering on the record the need

and cost-effectiveness of the Midland plant or any other proposed or existing construction project:

"2. The proceeds from the sale of said first mortgage bonds authorized by this order shall be used for the acquisition of property, the construction, completion, extension or improvement of facilities, or for the improvement or maintenance of service, or for the discharge or lawful refunding of obligations, including short-term bank loans, which may be made for such purposes.

\*  \*  \*

"4. Our action herein approving the issuance of $55,000,000 of first mortgage bonds shall not be construed as passing upon the necessity for or feasibility of the Ludington Pumped Storage Generating Plant project."

Later in 1968, a similar application for first mortgage bonds resulted in the same litany of conclusions and the authorization to issue another $55,000,000 of bonds. MPSC securities case no U-3229 (September 12, 1968).

From 1969 to 1977, as the commission authorized every securities request without requiring the utility to specify on the record for what projects the funds were to be used and without examining on the record the need and cost-effectiveness of any new or existing construction program. During this period, there were at least 23 securities requests by Consumers which resulted in the authorization to issue various types of securities without any record of evaluation by the MPSC other than its litany that the utility's expenditures were economically necessary "for the acquisition of property, the construction, completion, extension, or improvement of facilities, or for the improvement or maintenance of service and were lawful,

essential and reasonably required for the purposes
of the utility".

It was not until 1977 that the MPSC in a securi-
ties case addressed the general needs of Consum-
ers' ongoing construction program as it related to
energy production. In MPSC case no U-5388 (May
16, 1977), in an application hearing for authority
to issue and sell securities, the utility presented
evidence of future energy production and sales
forecasting. The MPSC implicitly adopted this evi-
dence as justification for the order to issue the
securities even though need of the Midland plant
was not considered by name. However, the staff of
the MPSC requested that in all future applications
the utility should present evidence "supported
with testimony, [which gives] a full summary of
the extent of its construction program relating
that program in a precise way to its estimate of
future energy sales and load for both electric and
gas operations".

The commission thereafter continued to require
the utility in securities requests to present evi-
dence on energy and sales forecasting. It was not,
however, until 1978 that the MPSC started to
question the testimony and data presented by
Consumers Power. In MPSC case no U-5836 (Au-
gust 21, 1978), the commission stated in its find-
ings of fact that:

"The staff, through its counsel, supported the pro-
posal of Consumers Power Company, but expressed
concern over the possibility that applicant would have
excess generating capacity, over and above reasonable
reserve capacity, in the early 1980s. The staff requested
that in its next security issue application Consumers
Power Company present proofs regarding the likelihood
and extent of capacity in excess of reasonable reserve
requirements and plans or studies for the utilization of
such excess capacity if it materializes."

Yet, it still did not require the utility to specify what projects the funds would be used for, or determine the need and cost-effectiveness of its ongoing construction program.

In MPSC case no U-6068 (October 9, 1979), the Michigan Citizens Lobby (MCL), Public Interest Research Group in Michigan, and the Great Lakes Energy Alliance intervened, challenging the Midland plant in a securities request where the MPSC authorized the utility to sell various types of stock to finance its construction program. The intervenors presented evidence that a delay in the construction of the Midland plant for one year would benefit ratepayers by $110.2 million. In addition, they argued, through their introduction of evidence, that the funds to be generated by the requested securities were not reasonably required for the utility's ongoing construction of the Midland plant as there were less expensive ways to produce electric energy. *Id.*

The commission rejected these contentions, ruling that the requirements of the securities statute were met as the funds were for the purpose of constructing nuclear plants. "As is evident from the statute, the purpose need not be reasonable; the purpose [of construction] need only be lawful. The use of the funds, however, must be reasonable."[4] Thus, the position of the commission was to implicitly accept that the purpose of construction was reasonable by using a limited and erroneous construction of "lawful" to find a lawful purpose and then only requiring that the use of the funds

---

[4] The commission's reasoning is erroneous. MCL 460.301(1); MSA 22.101(1) provides that the MPSC must find that "the use of the capital or *property* to be acquired to be secured by the issue of the [securities] is reasonably required for the purposes of the * * * corporation". In other words, the property must be reasonably required for a proper utility purpose. The use of funds derived must be lawful and essential under subsection (3).

be reasonably related to accomplishing the construction.

In MPSC case no U-6360 (August 4, 1981), the instant matter, the utility requested authority to issue various securities so that it could continue its construction program which included the Midland plant. The Attorney General and the MCL once again intervened, presenting evidence that the Midland plant was not cost-effective and that the applicant's energy and sales forecasting was inaccurate. The position of the intervenors was that the MPSC had never approved the Midland project by investigating its economics. They believed that the utility had to prove:

(1) that the applicant's long-range energy forecasts and generation planning are reasonable and require construction of the Midland plant;

(2) that the proceeds of the issuance are reasonably required for Midland, as opposed to an alternative;

(3) that the amount of the proceeds requested for the plant is reasonable;

(4) that issuing securities for the amount requested is essential for successfully meeting the applicant's generation needs.

The commission, however, ruled that the evidence of forecasting and cost-effectiveness was not at that point relevant in making a determination regarding the issuance of securities needed to finance ongoing construction of the plant. Under its interpretation of the securities statute, the MPSC stated that "it is not reasonable in the context of securities proceedings to examine the need for, and the cost-effectiveness of the power plant *once actual construction has commenced* and that such examination does not further the purpose of the securities act to protect against overca-

pitalization and serve the interests of customers in efficient and uninterrupted service at a reasonable rate" (emphasis in original).

In security case no U-6360, the MPSC had changed its position established in security case no U-6068 where it had maintained that a determination of the legislative standard "reasonably required" need not include a determination of need and cost-effectiveness. Thus, in the later security case no U-6360 its position seemed to be implicitly that such a determination was necessary and had been made in the earlier proceedings but once actual construction was commenced such an examination does not achieve the purpose of the act which is to protect against overcapitalization and to serve the interest of ratepayers. Furthermore, the MPSC recognized that the securities act concerned not only overcapitalization but "the interests of customers in efficient and uninterrupted service at a reasonable rate".

In short, a review of the important security order cases during the various phases of construction of the Midland plant indicates the following:

(1) That throughout the years the proceedings under the MPSC have become more adversarial and complex, but the issues have only recently been better defined on the record.

(2) The MPSC has never on the record indicated specifically the project's inclusion in the utility request for the securities approval nor has an MPSC order specified for what project the funds from the authorized securities would be used.

(3) The commission has never on the record conducted an analysis of whether the Midland plant was needed and cost-effective, but has entered orders requesting such information from the utility.

(4) The MPSC has changed its position on whether a determination of need and cost-effectiveness ever has to be made under the securities act from denying such a determination had to be made to stating such a determination had to be made but only in connection with approval of the first securities application.

(5) The MPSC has recognized that a securities act proceeding concerns not only overcapitalization but also service at reasonable rates.

*2. Rate Order Cases*

The MPSC and the utility, in response to the Attorney General's demand for an examination of need and cost-effectiveness, argue that the Midland plant has been "considered" in seven rate cases since 1970. An extensive review of these orders, however, initially indicates more concern by the MPSC with the utility's decline in earnings as it relates to the rate base than in the feasibility of the financing of new and ongoing construction of energy plants.

In MPSC rate case no U-4174 (November 24, 1972), the utility requested a rate increase of $29,012,000. Because of the utility's declining earnings and lack of ability to finance its construction program, the MPSC required the utility to file a proposed financing plan for the next five years and to file a semi-annual report on the progress of its construction program including "the status of each project, an estimate of percentage completion, expected in-service date, slippage from initially projected in-service date, * * * current estimated cost and initially estimated cost and other significant data".

In MPSC rate case no U-4576 (January 23, 1975), the commission, without identifying the

Midland plant, rejected the Attorney General's argument that the costs of Consumers' new generating plants were irrelevant as it related to inclusion in the rate base. Thus, the MPSC was concerned with the utility's erosion of earnings and not with the need and cost-effectiveness of any energy plants.

The MPSC, however, showed some movement in "considering" the Midland plant in MPSC rate case no U-5331 (July 31, 1978). The Public Interest Research Group in Michigan (PIRGIM) intervened and requested that all construction work in progress related to the Midland plant be excluded from the utility's rate base. The issue arose because PIRGIM believed that Consumers' load forecasting techniques were inaccurate. The commission, without addressing whether the specific forecasting was accurate, ruled that the construction work in progress associated with the Midland plant should be included in the rate base because sale and demand forecasting is inexact; some growth in demand was expected; the commission believed that the plant would provide power at a comparable price; and the cost of absorbing the Midland plant would be less than the cost of terminating construction.

Although the commission in this rate case included the costs of the construction work in progress of the Midland plant in the rate base, there was no examination of need and cost-effectiveness of the plant.

In MPSC rate case no U-5281 (March 14, 1980), the commission, on its own motion, addressed the appropriate treatment for ratemaking purposes of the direct and indirect costs of construction. By following its past practice, the commission included construction work in progress in the rate base but listed the allowance of funds used during

construction as an increase in the utility's net operating income.

In rate case no U-5979 (August 8, 1980), although the MPSC included the construction work in progress associated with the Midland plant, it refused to include a transmission plant used with the Midland plant because the Midland plant was not yet operational. Once again the commission refused to consider that the utility's load forecasting was unreliable as it related to the Midland plant.

In addition, MPSC recognized that the utility had to develop a plan which would employ cost-effective load management and conservation tools as an alternative to power plant construction. After millions of dollars had already been spent on the Midland plant, the MPSC finally recognized that some sort of cost-effectiveness analysis had to be made of energy plants in future rate cases.

In summary, we find that there has been a steadily increasing depth of consideration of the Midland plant in the rate cases. Our question, therefore, is whether the limited and fragmented inquiry in the rate cases is sufficient to fulfill the legislative requirements of the securities act.

Incidentally, we review only the *Consumers Power* record in depth as it is for a longer period and fuller and presents the problems we must consider.

## V. Securities Act

The basic issue in these cases, we have said, is the amount of protection the Legislature intended in the securities act to provide both utility investors and ratepayers through the MPSC. We have observed that there are essentially three types of

protection in question: complete feasibility investigations, first, at the original financing application; second, at subsequent financing applications; and third, at rate proceedings. In these cases there is no issue that such investigation is not required at the third or rate hearing. Our basic issue then is whether a complete feasibility examination is required first, at the original financing application, and second, at subsequent financing applications. The Attorney General contends the answer is yes as to both. The utilities contend there was such an examination at the original financing whether required or not and that no such examination is required at subsequent applications. The MPSC contends the answer is yes in the first instance but no in the second. Our brother LEVIN holds no such examination is required either time. We hold such an examination is required at the original financing application but normally not at subsequent ones.

Let us for convenience set forth the pertinent statutory language again:

"Sec. 1(1) [Certain public utilities] * * * may issue [more than 12-month securities] if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations * * * if the public service commission issues an order authorizing the issue and the amount of the issue, and states that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of the [securities] is reasonably required for the purposes of the * * * corporation * * *. Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base.

* * *

"(3) If from the application filed and other information obtained from the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes * * * the commission shall grant authority to make the issue * * *."

The most significant and important consideration in these cases, and more broadly in the kind of protection both utility investors and ratepayers will receive in Michigan, is how this Court reads the Legislature's intention in the securities act. In order to make an informed judgment, it is well to study the analyses of the parties in these cases.

## A. Party Analysis

The Attorney General's brief instead of making its own analysis of the pertinent statutory language sets forth the colorful opinion of the hearing officer in the Consumers Power case. This opinion finds that the Legislature in the securities act intended the MPSC to make a complete feasibility investigation at both the original and subsequent financing applications. The hearing officer's opinion states in part:

"[D]o the provisions of the securities act permit an inquiry into the cost-effectiveness of Midland versus other generating or construction alternatives? Is this a relevant issue in this proceeding? This administrative law judge finds and concludes that it is.

"First, the plain language and *structure* of the securities act must be examined. Section 3 requires a finding that the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes, are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes. Section 1 requires the commission to state in

its opinion that the funds (from the securities issuance) are reasonably required for the purposes of the corporation. As such, this applicant must show not only that the funds are for a lawful purpose but that they are reasonably required. The requirements in section 1 are separate and distinct from the requirements of section 3. Neither section depends upon an interpretation of the other section to ascertain its meaning. Each may be read separately without resort to the other.

"In section 3, the word 'purposes' appears twice in the first sentence. The first time it is used it is modified by the word 'lawful'. The second usage of the word 'purpose' in the same sentence must carry the same modification. That means that that part of the sentence should read as though it says * * * and that the issue and amount is essential to the successful carrying out of *that lawful purpose.*

"No such modification of the word 'purposes' appears in section 1. Its omission must be considered to be intentional and done for a reason. That reason is that the Legislature did not intend to tie the commission down to looking at only whether the purpose was lawful, and then examining whether the funds were essential to carrying out *that specific lawful purpose,* and whether they were reasonably required for *that specific lawful purpose.* If the legislative intent were different, it would have included the above requirements in the same section under the same modification to the word 'purpose'.

*"Is this interpretation practical? Everybody agrees that at the least the statute is designed to prevent overcapitalization. Only the above interpretation will serve that interest. Assume, in an admitted absurdity, that XYZ Electric Company desires to reproduce a 'Taj Mahal' for its general offices. Under the interpretation of the applicant and the staff, we first look to see if it is a lawful purpose. Yes, XYZ Electric Company has a perfect legal right to construct such a building. Then we would look at subsequent security issues to determine only whether they were essential to complete that project and whether they were reasonably required to complete that project. Under the applicant's and staff's interpretation, those security issues would be approved*

*with no further inquiry and examination than that.
When the cost of the 'Taj Mahal', or part of it, is later
rejected for inclusion into the rate base, overcapitaliza-
tion will have automatically occurred, and the commis-
sion will have been powerless to stop it under the
applicant's and staff's interpretation of the securities
act.* [Attorney General's emphasis.]

"But the securities act was designed for just the
opposite purpose—to give, not deny, the commission an
opportunity to take a look at the possibility that overca-
pitalization might occur if a certain securities issuance
is approved. Under the applicant's and staff's interpre-
tation of the securities act, overcapitalization in the
above example could only be prevented by including the
project in the rate base. The investor would then be
protected, but only at the expense of the ratepayers."

The defendant utilities did not directly interpret
the language of subsections (1) and (3) establishing
the criteria for MPSC judgment in allowing a
securities issue. Consumers Power concentrated on
the alleged discretionary power of the MPSC in
making an investigation rather than concentrating
on what the Legislature obliged the MPSC to find
before authorizing a securities issue. It is true
subsection (2) does give the MPSC discretion as to
the depth of investigation it will undertake. But
subsections (1) and (3) establish what the MPSC
must find, and the Consumers Power brief does not
come to complete grips with analyzing those sub-
sections. The Detroit Edison brief likewise does no
basic analysis of the language of subsections (1)
and (3), although it extensively reviews MPSC
interpretation of the statute. While the Detroit
Edison brief refers to the discretionary limits of
the commission's investigation, it relies mostly on
the idea that the transmission act is *the,* and in its
mind the only, "appropriate time and place for
extensive review of the need for a power plant",

and also on the idea that the utilities can finance construction projects with short-term debt without commission approval.

The MPSC brief makes a thorough and specific analysis of the language of subsections (1) and (3), more particularly in its *Consumers Power* case brief. After quoting the statutory language with emphasis on the appropriate words, the brief refers to and quotes from Michigan case law. Among the pertinent quotations are the following extracts.

"The commission is concerned with the stock, or bond, issue, the foundation, security and necessity therefor, and the purposes to which the fund acquired by sales thereof are to be devoted." *Venner v Michigan Railroad Comm,* 205 Mich 573, 582; 172 NW 567 (1919).

"Proper securities regulation serves the interest of the ratepayers in assuring continued service without interruption from utilities and in receiving that service at reasonable rates." *Michigan Gas Storage Co v Public Service Comm,* 405 Mich 376, 391; 275 NW2d 457 (1979).

"Briefly, we are convinced that securities regulation was intended to, and does, protect interests which rate regulation alone could not effectively control. It serves the interests of both the investors in, and creditors of, a company organized and operating and issuing securities under the laws of this state and those of ratepayers in efficient and uninterrupted service at reasonable rates. *People v County Transportation Co,* 303 NY 391; 103 NE2d 421 (1952), *app dis* 343 US 961 (1952). There is no reason to believe that the Legislature intended to reserve use of this valuable tool for serving the public interest to cases where rates are also being regulated while leaving some companies free to issue securities without public participation. The statutory language gives no indication of any such intent and we will not read limiting language into it." *Indiana & Michigan Power Co v Public Service Comm,* 405 Mich 400, 410-411; 275 NW2d 450 (1979).

With that general introduction, the MPSC brief directs its attention to the interpretation of subsections (1) and (3) of MCL 460.301; MSA 22.101 directly as follows:

"1909 PA 144, § 1, *supra,* is clear and unambiguous with respect to the purposes for which securities may be issued by an electric utility. An electric utility may only issue securities for the acquisition, construction, or improvement or capital assets used in its business of providing utility service or for the refunding or discharge of obligations previously issued for that purpose. 1909 PA 144, § 1, *supra,* is also clear and unambiguous with respect to the commission's duty to authorize the issuance of securities when the proceeds are to be applied to a lawful purpose of an electric utility and the issue and amount is essential to the successful carrying out of the purpose of an electric utility. Electric generating facilities are capital assets and security for debt and stock. The acquisition or construction of electric generating facilities is a lawful corporate purpose of an electric utility and necessary for the utility to provide service. Thus, if there were no other requirements in 1909 PA 144, § 1, *supra,* the commission would have to authorize an electric utility to issue securities in the amount necessary to construct an electric generating facility. However, 1909 PA 144, § 1, *supra,* requires that securities may only be issued if the commission authorized the issuance in an order stating the use of the capital secured by the debt or stock is reasonably required for the purposes of the electric utility, and the meaning of the term 'reasonably required' is what this Court must determine.

"The Court's determination of the legislative intent in requiring the commission to state that the capital to be acquired by the issuance of securities for the continued construction of electric generating facilities is reasonably required for the purposes of an electric utility in an order authorizing the issuance of such securities will decide this case and affect pending security cases and future security cases under 1909 PA 144, § 1, *supra.*"

The MPSC brief then concluded as follows:

"A thorough and complete inquiry by the commission
into the necessity of the initial issue of securities for
the construction of generating facilities is appropriate.
However, once construction of a legitimate utility proj-
ect is commenced, and particularly where construction
is well-progressed toward completion following previous
commission security and rate case determinations, as in
this case, the continued construction of generating facil-
ities need not be subject to a securities inquiry equally
as extensive as the initial inquiry, because of the time
involved and the resulting uncertainty upon the invest-
ment community as to whether the commission would,
year after year, authorize additional securities for a
project. Thorough and repeated inquiries before the
commission relative to the need or cost-effectiveness of
plants under construction or nearing completion also
unreasonably focuses upon the same or similar issues,
are duplicative, and cause unreasonable delays in both
the construction itself and the financing thereof."


*B. Our Analysis*

Again for convenience, let us set out the perti-
nent language of subsections (1) and (3) of MCL
460.301; MSA 22.101, because it is the guide to our
proper interpretation of the Legislature's inten-
tions as to the protection it wished to provide:

"Sec. 1(1) [Certain public utilities] * * * may issue
[more than 12-month securities] if necessary for the
acquisition of property, the construction, completion,
extension, or improvement of facilities or for the im-
provement or maintenance of service or for the dis-
charge or lawful refunding of obligations * * * if the
public service commission issues an order authorizing
the issue and the amount of the issue, and states that
in the opinion of the commission the use of the capital
or property to be acquired to be secured by the issue of
the [securities] is reasonably required for the purposes

of the * * * corporation * * *. Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base.[5]

* * *

"(3) If from the application filed and other information obtained from the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes * * * the commission shall grant authority to make the issue * * *."[6]

[5] The provision reads as follows:

"A person, corporation, or association, or a lessee or trustee of a corporation or association, except a municipal corporation or the owner of a renewable resource power production facility as provided in section 1a, organized or authorized to do business under the laws of this state, owning, conducting, managing, operating, or controlling a plant or equipment within this state used wholly or in part in the business of transmitting messages by telephone or telegraph, producing or furnishing heat, artificial gas, light, water, or mechanical power to the public, directly or indirectly, a railroad, interurban railroad, or other common carrier, or a corporation, association, or individual exercising or claiming the right to carry or transport natural gas for public use, directly or indirectly, or petroleum oil by or through a pipeline or engaged in the business of piping or transporting natural gas for public use, directly or indirectly, or engaged in the business of purchasing natural gas for distribution may issue stocks, bonds, notes, or other evidences of indebtedness payable at periods of more than 12 months after the date of issuance, if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations and may issue stock to represent accumulated earnings invested in capital assets and not previously capitalized, if the public service commission issues an order authorizing the issue and the amount of the issue, and states that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of the stock, bonds, notes, or other evidences of indebtedness, is reasonably required for the purposes of the person, corporation, or association, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized. Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base."

[6] MCL 460.301(3); MSA 22.101(3). The provision provides that:

"If from the application filed and other information obtained from

The following criteria clearly express the Legislature's intentions as to what protections it had in mind. "[C]orporation * * * may issue [securities]"

(1) "if necessary for the acquisition of property, the construction, completion, extension, or improvement of facilities * * * or for the discharge or lawful refunding of obligations"

(2) "if the public service commission issues an order authorizing the issue and the amount of the issue * * *"

(3) [if the commission] "states that in the opinion of the commission the use of the * * * property * * * is reasonably required for the purposes of the * * * corporation"

(4) there is no presumption that approval of securities means inclusion in rate base

(5) "if * * * the commission is satisfied the funds derived from [the securities] are to be applied to a lawful purpose"

(6) "if * * * the commission is satisfied * * * that the issue and amount is essential to the successful carrying out of the purposes"

*(1) Necessary for Acquisition of Property, etc.*

This criterion obviously limits the purposes for which the funds from a security issue may be used. It appears to cover a fairly broad spectrum of projects. Whether it is intended to be inclusive or exclusive, we need not here decide, as the

the investigation authorized in this act the commission is satisfied that the funds derived from the issue of stocks, bonds, or notes are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes, or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized, the commission shall grant authority to make the issue. In granting the authority, the commission may impose as a condition of the grant reasonable terms and conditions that the commission considers proper."

projects at issue in these cases appear to fall well within the spectrum. The major project is the completion of a nuclear reactor. There is also some refunding.

## (2) Authorization of Issue and Amount of Issue

This criterion is important in that in addition to approving an issue, the commission must authorize the amount of the issue. This point ties in with the same point made in succeeding criteria when the significance of the point becomes more apparent.

## (3) Reasonably Required for the Purposes of the Corporation

This criterion is a crucial one in our consideration as to the depth of protection the securities act provides. No securities may issue unless "the capital or *property* [is] * * * reasonably required for the purposes of the * * * corporation" (emphasis added). As noted in this case we are principally concerned with property, completing a nuclear reactor.

The phrase "purposes of the * * * corporation" is pregnant. It embodies the whole utility regulatory scheme, because the purposes of the utility corporation must be consonant with the aims of regulation. The aims of regulation envision economically healthy corporations providing adequate services at reasonable rates and earning reasonable profits. As a consequence, the project to be financed by the securities issue is impregnated with that purpose. The project must be devoted to providing adequate service at a reasonable rate and earning a reasonable profit.

The phrase "reasonably required" indicates that the MPSC may not authorize the issue of securities unless in its opinion the "use of the capital or *property* to be acquired to be secured by the issue

of [securities] is reasonably required for the purposes of the * * * corporation". In other words, the commission must have satisfied itself that the project to be undertaken is reasonably required to further a corporation purpose such as we have described.

Obviously this charge upon the MPSC is a heavy one. It must determine and state that in its opinion the project is reasonably required in the context of the aims of the regulatory system, *i.e.,* a healthy utility rendering adequate service at a reasonable rate and earning a reasonable return. It is impossible to visualize this determination except after a complete feasibility examination.

*(4) No Presumption Securities Approval Means Automatic Rate Base Inclusion*

This provision is sometimes cited to argue that subsection (1) does not require a complete feasibility examination. In our opinion the correct interpretation of this subsection is quite the opposite. Consideration of the exact language is significant:

"Approval of securities does not presume that the projects to be constructed or property to be acquired will be included in the company's rate base."

This language was not originally a part of § 1(1). It therefore was presumably an afterthought because of conduct reactive to the original section. That conduct must have been the presumption that securities approval was equivalent to inclusion in the rate base. Inclusion in the rate base, however, cannot be presumed without some kind of feasibility examination, showing that the addition of the property to the base would be consonant with reasonable consumer rates and a reasonable rate of return to the utility. Obviously no such determi-

nation could be made without a feasibility study to some degree.

What then is the significance of the "no presumption" provision? Does it mean, as some believe, that feasibility examinations should cease or does it mean, as the language implies, that approval of securities creates no presumption of inclusion in the rate base? It is submitted that the latter interpretation is the correct one. On the one hand, if the Legislature had intended to ban feasibility examinations, it certainly would have used words to directly indicate that, which, of course, it has not. On the other hand, the "no presumption" proviso is perfectly compatible with the requirement of a feasibility study, in fact the only reason for having one. The occurrence of unforeseen factors or change in the economic situation or change in technology, engineering or management over the course of completing a project might very well mandate a new feasibility examination, for example.

In short, we believe the no-presumption proviso in no way prohibits feasibility studies but rather is perfectly compatible with them, in fact, implies that they are required.

### (5) Funds Derived Applied to Lawful Purpose

The first thing to note is that this provision is in subsection (3) and the prior ones were in subsection (1). Subsection (1) concerns the propriety of the "use of capital or *property*". Subsection (3) concerns "funds derived" rather than "use of capital or *property*". This provision calls upon the MPSC to determine that the funds derived from the securities issue are not to be applied in violation of state or federal law. This, of course, was a significant factor in the construction of the Midland reactor where the federal government was

constantly changing safety regulations and requirements.

## (6) Issue and Amount Essential

This provision ties in with provision 2. The commission must determine that the security issue will raise funds appropriate to carrying out the purposes, as approved in (3) and (5).

Our analysis of the pertinent provisions of MCL 460.301; MSA 22.101 makes clear that the MPSC, at least before approval of the original securities application, must make a complete feasibility examination to satisfy the statutory mandates.

Construing all these provisions together, we perceive that the Legislature had different although somewhat overlapping aims in subsections (1) and (3). In subsection (1) the Legislature mainly sets up objectives for the security issue. In subsection (3) the Legislature sets up tests for the "funds derived" from the securities.

In subsection (1), the Legislature set up two objectives. They both relate to "capital or property". The first objective is that the securities must be for either the acquisition or improvement of property or the discharge or refunding of obligations. The second objective is that the "use of capital or property" be reasonably required for the use of the corporation.

In subsection (3) the Legislature sets up two tests for the "funds derived" from the securities. First, the funds had to be applied to a lawful purpose. Second, the funds must be essential for the carrying out of the purposes of the corporation.

In these cases, the application of the objectives of subsection (1) shows first the nuclear reactor falls within "the completion * * * of facilities" test and second (2) the nuclear reactor must be

found by the MPSC to be reasonably required for the purposes of the corporation.

In subsection (3), the MPSC must find that the funds derived from the security issue are first, to be applied to a lawful purpose, and second, essential to the successful carrying out the purposes of the corporation.

The same kind of analysis could be made of that portion of the security issue devoted to the discharge or lawful refunding of obligations.

In short, we believe that the Legislature, by requiring securities to be reasonably required for the purpose of the applying utility, expected the MPSC to balance the interests of investors and ratepayers along with the interests of the utility *before* the original securities are issued to finance the construction of electric plants. In fact, the Legislature has given the MPSC broad powers in determining whether the commission should grant authority to issue securities. For the purpose of enabling it to determine whether or not it should issue such an order, the MPSC "may make an inquiry or investigation, hold hearings, and examine witnesses, books, papers, documents, or contracts the commission considers of importance in enabling it to reach a determination". MCL 460.301(2); MSA 22.101(2).

This balance will be achieved if the MPSC makes a complete feasibility examination at the time of the original application for financing and later evaluates the costs of the project when the utility requests inclusion in the rate base. Thus, we do not believe that the legislative intent was to allow a utility's investors to invest billions of dollars in a facility that the MPSC claims will be evaluated for viability at the time a company requests inclusion of the costs of such facility in its

rate base. Such a result would be inherently unfair to investors, the utility and its ratepayers. Moreover, this approach implies that a utility can proceed at its own risk even though the costs of construction may ultimately leave the utility impoverished and the ratepayers with an unwontedly swollen rate base. The commission has been forced to address this dilemma. It now recognizes that some type of determination or thorough inquiry should be made before the initial issuance of securities for the construction of an energy plant.

We agree with the commission, however, that in these particular cases it is too late in the day to make a *post hoc* examination about the need and cost-effectiveness of the plants. Therefore, we hold that the legislative standards of the act require the MPSC to make a thorough and complete inquiry into the necessity and cost-effectiveness at the time the commission is considering the initial issuance of securities for the construction of an energy plant.[7] Once construction of a lawful project is commenced after the initial issue is autho-

---

[7] MCL 460.301(1); MSA 22.101(1) becomes operative when (1) securities are issued for the "acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations"; and (2) securities are payable at periods of more than 12 months after the date of issuance.

A utility can proceed two ways in financing plant construction. It can, as occurred in the instant case, announce its plans to build a plant and then request securities payable at periods of more than 12 months to finance beginning construction. It is also possible that a utility could borrow money, or issue short-term evidence of indebtedness payable at periods of less than 12 months, to finance beginning construction. At some later date, it would then request securities or evidence of indebtedness payable at periods of more than 12 months to repay the obligations which were entered into for the construction of the plant.

The Legislature has stated that the standards of the act should be applied in both settings. In fact, this has been the position of the MPSC [MPSC's Appendix, p 12b]. Thus, our holding, by interpreting the act, must be followed in both settings.

rized, a redetermination should not be necessary under our statutory interpretation.

## B. Case Law

Our interpretation of the securities act is supported by the relevant case law. We recognize that the interpretation of this statute by this Court has not remained static. Initially, we perceived the legislative purpose of the statute as protecting investors against the evils of overcapitalization. See *Peninsular Power Co v Secretary of State,* 169 Mich 595, 600; 135 NW 656 (1912). The early concern was not so much with the consuming public or ratepayers but with the equity or future equity owners of the utility companies. *E.g., Hillsdale Light & Fuel Co v Michigan Public Utilities Comm,* 220 Mich 101, 105; 189 NW 893 (1922); but see *Venner v Michigan Railroad Comm,* 205 Mich 573, 583; 172 NW 567 (1919).

Recently, this Court has broadened its interpretation of the apparent purpose of MCL 460.301; MSA 22.101. See *Indiana & Michigan Power Co v PSC,* 405 Mich 400; 275 NW2d 450 (1979); *Michigan Gas Storage v PSC,* 405 Mich 376; 275 NW2d 457 (1979). By recognizing that securities regulation and a utility's financial structure will impact on rates, we stated that securities regulation achieved important legislative objectives by protecting investors of a utility, creditors, and equally important, protecting ratepayers by assuring "efficient and uninterrupted service at reasonable rates". *Indiana & Michigan Power, supra,* 410. See also Roach & Reiss, *Administrative Law, 1979 Ann Survey of Mich Law,* 26 Wayne L Rev 359, 364 (1980).

In both cases, the utility companies filed applications with the MPSC for a disclaimer of jurisdiction or, alternatively, application under protest for

authorization to issue securities. The MPSC denied the request for disclaimer of jurisdiction and authorized the proposed securities. It also required both companies to pay fees based on the face value of the securities, which the utilities paid under protest. In addressing the basis under which the MPSC could assert jurisdiction over the utilities in a securities request, we unanimously stated that the apparent intent of the Legislature was not to protect only investors:

"Briefly, we are convinced that securities regulation was intended to, and does, protect interests which rate regulation alone could not effectively control. It serves the interests of both the investors in, and creditors of, a company organized and operating and issuing securities under the laws of this state and those of ratepayers in efficient and uninterrupted service at reasonable rates." *Indiana & Michigan Power, supra,* 410.

Although the Michigan courts until *Indiana & Michigan Power* seemed more concerned with the effects of overcapitalization on investors than on ratepayers, it was not so with the state of New York which has always had a similar statute.[8] In

[8] The New York statute was enacted in 1907 which was two years before the Michigan statute. In fact, Justice BIRD, in *Venner, supra,* 580, stated that "[t]he Michigan public utility act was taken bodily from the New York act".

The original New York statute provided:

"A gas corporation or electrical corporation organized or existing, or hereafter incorporated, under or by virtue of the laws of the state of New York, may issue stocks, bonds, notes or other evidence of indebtedness payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of its plant or distributing system, or for the improvement or maintenance of its service or for the discharge or lawful refunding of its obligations, provided and not otherwise that there shall have been secured from the proper commission an order authorizing such issue, and the amount thereof, and stating that, in the opinion of the commission, the use of the capital to be secured by the issue of such stock, bonds, notes or other evidence of indebtedness is reasonably required for the

fact, this Court has stated that the Michigan statute "may fairly be construed as though it read as the New York act reads". *Venner, supra,* 583.

In *People ex rel New York Edison Co v Willcox,* 207 NY 86, 93-95; 100 NE 705, 706-707 (1912), the New York court laid down the standard by which the New York Public Service Commission (NYPSC) had to fulfill in regulating utilities under the New York statute. In that case, the New York Court of Appeals reversed an order of the NYPSC which authorized the issuance of securities to be used in the acquisition of property upon which to construct power houses and substations. The court indicated that before a utility could issue securities to finance a new project under the New York statute the NYPSC had to protect the rights of the public by determining whether the new issuance, and implicitly the projects such securities would finance, were needed and would not lead to oppressive charges or rates:

"[The] law was enacted in response to a pronounced and insistent public opinion and was a radical and important modification of the relations and policy of the people toward the corporations which are its subjects. Its paramount purpose was to protect and enforce the rights of the public. It made the commissions the guardians of the public by enabling them to prevent the issue

said purposes of the corporation. For the purpose of enabling it to determine whether or not it should issue such an order, the commission shall make such inquiry or investigation, hold such hearings and examine such witnesses, books, papers, documents or contracts as it may deem of importance in enabling it to reach a determination. Such gas corporation or electrical corporation may issue notes, for proper corporate purposes and not in violation of any provision of this or of any other act, payable at periods of not more than twelve months without such consent; but no such notes shall, in whole or in part, directly or indirectly be refunded by any issue of stock or bonds or by any evidence of indebtedness running for more than twelve months without the consent of the proper commission. * * *" L 1907, c 429, § 69; Public Service Commissions Law, § 69.

of stock and bonds for other than statutory purposes, or in appreciable and unfair excess of the value of the assets securing them, and to prevent also unneeded or extortionate competition, or indifferent and unaccommodating methods of operation or oppressive or discriminating charges or rates." *Willcox, supra,* 93-94.[9]

Moreover, in *People v Liberty Light & Power Co,* 121 Misc 424, 426; 201 NYS 302 (1923), the court, in an action brought to recover a penalty imposed by the public service commission law of New York because the defendant failed to comply with the provisions in relation to the issuance of stock, stated that:

"The objects sought by the legislature in the regulation of public utilities by the law here in question were, the prevention of corporate abuses and the protection of the public against excessive rates for services, the overcapitalization and the watering of securities, the establishment of a reasonable basis in operating expenditure, and the maintenance of investment security. The law places upon such corporations the burden of proving the need and security in its ventures for financial and corporate extension and provides that it must establish before the commission the facts of the proposals for expansion as being for the best interest of the public."

Thus, our over-all reading of the case law which has interpreted the legislative purpose behind the two similar statutes indicates that there is a clear statutory duty under which the MPSC should operate. The recent case law in Michigan and elsewhere stands for the proposition that the Michigan statute should be read as broadly as possible so that this state's regulatory system can accommodate not only the interests of equity own-

[9] Accord, *People v County Transportation Co, Inc,* 303 NY 391; 103 NE2d 421, 424 (1952).

ers but also the interests of ratepayers when securities are requested.

## VI. MPSC COMPLIANCE WITH LEGISLATIVE CRITERIA

We have developed the criteria that the Legislature intended for MPSC use in determining whether securities should issue. There remains consideration of how the MPSC has met these criteria.

The securities act contemplates judicial review by certiorari. MCL 460.301(6); MSA 22.101(6). This means that in addition to conclusions of law there must be findings of fact that support such conclusions of law. The courts can then determine whether there are any errors of law and whether the findings of fact support the conclusions of law and whether there are facts in the record to support the findings of fact.

Our review of the security and rate orders indicates a distressing repetition of the language of the statute as legal conclusions without discernible findings of fact supporting such conclusory language.

### A. Security Orders

In 1967 Consumers Power announced plans to construct a nuclear generating plant at the estimated cost of $256,000,000. Between April 11, 1968 and October 9, 1980 the MPSC issued 30 security orders for Consumers Power construction programs, including Midland. It is to these security orders that MPSC and the defendant Consumers Power refer in claiming that the commission made a complete feasibility examination.

The first securities orders after the Midland plant announcement was case no U-3050, April 11, 1968. There is another 1968 order, case no U-3229,

September 12, which is practically a mirror copy. Whether either of these is the first case authorizing the Midland plant cannot be definitively ascertained from the record, because it was not until 1976 that the MPSC made a specific reference to Midland by name.

Case no U-3050, April 11, 1968, is set out in Appendix A attached hereto. Only by perusal of the entire order is it possible to understand the vague and conclusory nature of the document. Commentworthy, however, is:

1. There is no description whatsoever of any particular item for which funding is asked or given.

2. The statutory language of the criteria is quoted in the findings of fact, without any quoted factual basis whatsoever. For example, finding E states in part "in the opinion of the commission the use of the capital to be acquired by the issuance of said bonds is reasonably required for the purposes of the company". That is all there is. There is no reference either to what the use of the capital is to be or for what purpose of the company would require that use.

In short, the MPSC orders of this date in no way satisfy the requirements of MCL 460.301; MSA 22.101 nor the kind of record needed for judicial review.

*B. Rate Orders*

During the oral arguments, Justice KAVANAGH several times asked, "Was there any determination made before the plant was started that it was necessary?" Mr. D'Hondt for the MPSC replied that the MPSC eventually answered the question as to whether the plant was necessary in 1978 in *Re Consumers Power Co,* 25 PUR 4th 167 (case no U-5331, July 31, 1978). This case appears to be the

first time that the Midland plant was specifically considered by name. This case was a rate hearing case, and the question considered, which is of importance to us, is whether the construction work in progress costs of the Midland plant should be included in the rate base. The Public Interest Research Group in Michigan (PIRGIM) contended that Consumers Power power needs forecasting was so faulty that it could not be relied on and that there was no evidence that the Midland plant would be needed. The MPSC opinion and order's principal comment on PIRGIM's contention follows:

"Sales and demand forecasting is inexact at best, requiring subjective judgments in the adoption of assumptions and the choice of methods. Although improvements might be made in applicant's methods, the commission finds that on this record applicant's forecast of annual sales growth, the projected load factor, and the projected range of demand are not unreasonable. It is true that applicant's past forecasts have often been too high. However, forecasts are constantly being revised in response to changing conditions. It does not necessarily follow that because previous forecasts were too high that the present forecasts are likewise too high.

"Perhaps more important, even assuming applicant's forecasts are somewhat high, it does not follow that the Midland project is unneeded and therefore an imprudent investment to be totally excluded from the rate base. The record shows that some growth in demand is to be reasonably expected, in the absence of a drastic shift in usage patterns which cannot be reasonably assumed at this time. The Midland project is designed to be a major baseload plant and if it runs properly it should provide power at a price which is comparable to many other units. A temporary minor overcapacity would not be a justification for excluding the plant from the rate base. In a period of increasing construction costs, it may be cheaper to construct new plant now

than to delay construction for a significant period. In addition, applicant may have the opportunity to sell temporarily excess power.

"In any event, the costs of abandoning the Midland plant, as recommended by PIRGIM, have to be weighed against the benefits. Assuming applicant is close on its sales and demand predictions, abandoning the Midland plant, as PIRGIM contends should be done, would have serious and possibly catastrophic results for the supply of electricity in the 1980's and 1990's not only for applicant's retail customers but also for the whole state of Michigan. Moreover, the forced abandonment of all the Midland plant would be a financial disaster for applicant and would seriously compromise applicant's ability to finance any additional construction, including coal-fired and cogeneration facilities. Finally, to the extent that the financial community perceived the commission as acting irresponsibly by enforcing the abandonment of the total Midland project, all other utilities in Michigan would have increased difficulty in financing their construction projects.

"For these reasons the commission finds that the construction work in progress (CWIP) associated with the Midland plant should not be excluded from the rate base." 25 PUR 4th 179-180.

Obviously the MPSC has come closer to answering the criteria set forth in the securities act in 1978 than in 1968, although, of course, this is a rate, not a securities, case. However, even this much more specific treatment does not completely answer the question whether the property was reasonably required for the purposes of the corporation. Furthermore, this MPSC opinion illustrates the jeopardy in not making a feasibility study at the beginning. The MPSC reaches its conclusion in part by relying on the *in terrorem* argument that even if not cost effective "the forced abandonment of all the Midland plant would be a financial disaster for applicant [Consumers Power Co.]".

Further, "all other utilities in Michigan would have increased difficulty in financing".

## VII. Proposed Findings Standard

On the record before us, it would be difficult to attempt to definitively indicate those specific findings appropriate to support a conclusion that expenditure of funds was "reasonably required for the purposes of the * * * corporation". For a new generating plant for an electric utility, however, these are some of the specific findings that should be made:

1. the name and detailed description of the project for which funding is requested;

2. the amount of funding requested;

3. the estimated costs of the project and the bases for the estimates;

4. the amount of power the plant would generate by a particular time plus the amount of power from other sources of the corporation;

5. the amount of demand for that power and the source of such estimates;

6. the amount of reserve power appropriate and the sources for that conclusion;

7. whether there are other more efficient power sources and, if there are, why they are not to be used;

8. what effect the project will have on rates and why.

Such a determination should create no strain in the securities regulatory system in Michigan as the MPSC has acknowledged under the existing statute that "[a] thorough and complete inquiry by the commission into the necessity of the initial issue of securities for the construction of generat-

ing facilities is appropriate". As has been discussed, the paramount purpose of the securities statute is protection of the public which includes both investors and ratepayers. By addressing itself to the legislative standard as we view it before the financing of new energy plant construction commences, the MPSC ensures that the apparent legislative purpose of the statute will be fulfilled. It also ensures that all the citizens of this state shall have sufficient energy at the most reasonable rates.

## VIII. CONCLUSION

The issue before us is what is the extent of protection the Legislature intended to provide utility investors and ratepayers. We hold that the Legislature intended that (1) a complete feasibility examination should be made by the MPSC in connection with approval of the original application for securities, (2) upon subsequent applications it would suffice that the MPSC consider whether the statutory requirements were met with respect to the work to be next undertaken, and (3) a complete feasibility examination should be undertaken in connection with inclusion of the project in the rate base. We further hold that the MPSC in connection with its determinations must make specific, not conclusory, findings of fact.

BLAIR MOODY, JR., J., concurred with WILLIAMS, J.

APPENDIX A

STATE OF MICHIGAN
BEFORE THE MICHIGAN PUBLIC SERVICE
COMMISSION

\* \* \*

In the matter of the application
of Consumers Power Company          Case No.
for authority to issue first          U-3050
mortgage bonds.

At a session of the Michigan Public Service Commission held at its offices in the City of Lansing, Michigan, on the 11th day of April, A.D., 1968.

PRESENT: Hon. Peter B. Spivak, Chairman
Hon. Willis F. Ward, Commissioner
Hon. William A. Boos, Jr., Commissioner

SECURITIES

In this matter, Consumers Power Company (company) filed with this commission on March 8, 1968, an application praying for authority to issue and sell $55,000,000 aggregate principal amount of its first mortgage bonds.

Said matter was brought on for hearing before the commission on March 22, 1968, at the offices of the commission in the City of Lansing, Michigan.

From the application filed on March 8, 1968, the records and files of the commission, and the testimony taken, the commission finds that:

A. The company made capital expenditures during the year 1967 in the aggregate amount of $140,775,739; and it has made and proposes to make capital expenditures during the year 1968 in

the aggregate amount of approximately $194,394,-100.

B. The expenditures set forth in paragraph A above were and are necessary for the acquisition of property, the construction, completion, extension or improvement of facilities, or for the improvement or maintenance of service.

C. In order to provide a portion of the funds required for the purposes referred to in paragraph A above and for the discharge or lawful refunding of obligations, including short-term bank loans, made or expected to be made for such purposes, the company proposes to issue and sell $55,000,000 aggregate principal amount of its first mortgage bonds, of a series maturing May 1, 1998, for the best price obtainable in the judgment of the board of directors of the company, or the executive committee thereof, at competitive bidding.

D. No contract, agreement, or arrangement has been made or entered into by the company for the sale of the first mortgage bonds proposed to be issued by the company.

E. The funds to be derived from the issue and sale of first mortgage bonds are to be applied to lawful corporate purposes and that such issue and sale of said first mortgage bonds is essential to the successful carrying out of such purposes, and in the opinion of the commission the use of the capital to be acquired by the issuance of said bonds is reasonably required for the purposes of the company.

F. Company Exhibit 1 introduced at the hearing in this matter sets forth details of proposed plant expenditures totaling $194,394,100 for the calendar year 1968. Included in this total is the amount of $958,000 shown as relating to the Ludington Pumped Storage Generating Plant. The approval

herein given to the issuance of $55,000,000 of first mortgage bonds should not be construed as a finding of necessity for or feasibility of the Ludington Pumped Storage Generating Plant project.

G. The company has paid into the treasury of the State of Michigan the sum of $55,000, which is the statutory fee payable on the sum of $55,000,-000 of the first mortgage bonds herein authorized to be issued and sold.

Now, therefore, upon consideration of all the foregoing and by virtue of the power and authority vested in this commission by law, it is hereby ordered that:

1. Consumers Power Company be and is hereby authorized to issue and sell $55,000,000 aggregate principal amount of its first mortgage bonds, of a series maturing May 1, 1998, for the best price obtainable in the judgment of the board of directors of the company, or the executive committee thereof, at competitive bidding.

2. The proceeds from the sale of said first mortgage bonds authorized by this order shall be used for the acquisition of property, the construction, completion, extension or improvement of facilities, or for the improvement or maintenance of service, or for the discharge or lawful refunding of obligations, including short-term bank loans, which may be made for such purposes.

3. On or before December 31, 1968, Consumers Power Company shall report to this commission, by a statement duly certified by an officer of the company having knowledge of the facts, the principal amount of said first mortgage bonds sold by the company pursuant to this order, the interest rate thereof, the amount received by the company from the sale of said bonds, and the total expense of issuing and selling said bonds. The company

shall also file a copy of its fifteenth supplemental indenture as finally executed.

4. Our action herein approving the issuance of $55,000,000 of first mortgage bonds shall not be construed as passing upon the necessity for or feasibility of the Ludington Pumped Storage Generating Plant project.

The commission specifically reserves jurisdiction of the matters herein contained and the authority to issue such further order or orders as the facts and circumstances may require.

MICHIGAN PUBLIC SERVICE COMMISSION

*/s/ Peter B. Spivak*
_____

Chairman

(SEAL)

*/s/ Willis F. Ward*
_____

Commissioner

*/s/ William A. Boos, Jr.*
_____

Commissioner

By the Commission and pursuant to its action of April 11, 1968.

*/s/ Knight D. McKesson*
_____

Its Secretary